**STATE of Minnesota, Appellant,**

v.

**Stephan James ZANTER, Respondent.**

No. C7–93–2585.

Court of Appeals of Minnesota.

June 14, 1994.

Review Granted Aug. 29, 1994.

Jeffrey D. Thompson, Rice County Atty. and Robert R. King, Jr., Sp. Asst. Rice County Atty., Faribault, for appellant.

Paul C. Engh and Joseph S. Friedberg, Minneapolis, for respondent.

Considered and decided by SHORT, P.J., and RANDALL and HARTEN, JJ.

## OPINION

HARTEN, Judge.

The state appeals the pretrial suppression of certain items of evidence seized from respondent Steven M. Zanter's home on two of three occasions under separate search warrants. Zanter cross-appeals the admissibility of evidence of the victim's statements of fear, evidence of anonymous harassment of the victim and evidence of his retrieval of a manual from a coworker. We affirm.

## FACTS

The evidence consists of testimony presented in an omnibus hearing in March 1993. At approximately 11:20 a.m. on November 2, 1989, Sharon Bloom left work at 3M in Woodbury, where she was employed as a systems analyst. That evening, when she failed to return to the couple's Minneapolis apartment, Bloom's boyfriend reported her to the police as missing. Bloom's Honda automobile was found in the 3M parking lot. On November 12, 1989, her partially-clad body was discovered in a cornfield in Rice

County. Her head had been bludgeoned, causing severe bleeding.

Following Bloom's disappearance, investigators focused on circumstances surrounding her 3M employment. Zanter, a coworker, became a suspect because of his uncorroborated alibi. Zanter told investigators that on November 2 his car had stalled in Maplewood during the noon-hour. He said that an unidentified passing motorist, whom he was unable to describe, had assisted in jumpstarting his car. Zanter said that he then went to his home in Eagan, took a bath to warm himself, and called 3M to advise his supervisor that he would not be returning to work that day. Investigators were unable to locate the passing motorist to substantiate Zanter's alibi. Coworkers told investigators that Bloom and Zanter had been friends, although Zanter had appeared to be angered when Bloom received a promotion and he was passed over.

In the months preceding her death, Bloom had been the target of anonymous hostile pranks at work, including the taking of items from her locked desk. On one occasion, display transparencies that Bloom had prepared for an important presentation disappeared, then reappeared in a different area of her desk after the presentation. Four sets of keys were stolen from her desk and not returned. Coffee was poured on her chair cushion. Bloom related to coworkers that she feared for her life and had suspicions as to the identity of the harasser.

Zanter had previously occupied the same desk as Bloom and apparently was one of two employees who customarily arrived early at 3M each workday. One of Zanter's coworkers, Tamara House, testified that Zanter had loaned her a computer manual in 1986 or 1987. In 1989, House discovered that the manual was missing from the cabinet above her desk. After searching for the manual unsuccessfully, House approached Zanter and he admitted retrieving it from her cubicle. House told him that she was angry because he had entered her cubicle without her permission.

On November 16, 1989, a search warrant was executed, allowing a search of the Zanter residence for:

> clothing and personal [effects] belonging to or owned by Sharon Phyllis Bloom, including a skirt; shoes; underwear; a gray and brown purse and its contents including a calendar, address book, identification, keys and credit cards; a heavy blunt metal object indicating the presence of hair, blood, or bodily fluids; samples of hair, blood, bodily fluids, and possible finger prints of Sharon Phyllis Bloom.

Upon entering the house to execute the warrant, investigators observed Zanter painting the master bathroom, although the house was newly constructed and painted. They seized a Knox Lumber Company receipt dated November 4, 1989 from Zanter's master bedroom.[1] Investigators also searched Zanter's briefcase and discovered 25 photographs of women wearing shorts and swimsuits in boating or vacation settings. One of the investigators immediately recognized Zanter and Bloom's coworker, Donna Sommerfeldt–Bilicke, in many of the photographs. Until the discovery was brought to her attention, Sommerfeldt–Bilicke had neither suspected nor claimed that her photographs had been stolen. When she picked up her processed rolls of film and noticed that some prints were missing, she assumed that the 3M photo service had failed to print some of the negatives and she reordered prints.

On September 5, 1990, a second search warrant was issued to search Zanter's home for:

> Evidence relating to the cause, matter, or motive in the death of Sharon Phyllis Bloom including hairs, blood, clothing, fibers and fingerprints; any weapons or instruments which could cause blunt force trauma; and documents, records, notes, correspondence, which could be used to establish a motive for homicide, including bank records, checks and credit card account statements.

Luminescent testing revealed no blood on the master bathroom walls. A blue sock similar

---

1. Later, in July 1990, a further investigation of the receipt indicated that it was for paint, brushes, spackle, and a drip cloth that had been purchased by check.

to a sock found between the legs of the victim was seized. Carpet fibers from the sock found on the victim are assertedly comparable to carpeting in Zanter's Eagan home and his previous home in Burnsville.

On February 23, 1992, an investigator interviewed four of Mrs. Zanter's elementary school teacher colleagues. They disclosed that on November 3, 1989, Mrs. Zanter had said that she was upset about finding blood splattered on the walls and carpet in several places in her home on November 2, 1989 and she requested advice on stain removal. Stephan Zanter had explained to her that he had accidentally cut himself. Based on this new information, on March 5, 1992, a third search warrant was issued for the Zanter home. The warrant authorized a search for:

Evidence relating to the cause, matter, or motive in the death of Sharon Phyllis Bloom including hairs, blood, clothing, fibers and fingerprints; any weapons or instruments which could cause blunt force trauma; and documents, records, notes, photos, correspondence, which could be used to establish a motive for homicide, including bank records, checks and credit card account statements; to include samples of carpet, carpet pad, woodwork, wallboard and flooring materials.

Except for reference to carpet, woodwork and materials, this authorization is identical to that in the 1990 warrant. The search resulted in the discovery of blood-stained jute carpet backing on the stairs and landing. Bloom's Honda keys were found clipped to safety pins in a dresser drawer in the basement. Keys to Bloom's St. Paul condominium were found in drawers in the master bedroom and bathroom. The investigator who seized the keys was aware of Bloom's habit of pinning keys to her purse.

In October 1992, Zanter was indicted for first and second degree murder. After an omnibus hearing, the district court suppressed the Knox Lumber receipt, the Sommerfeldt–Bilicke photos, and the keys to the Honda and condominium. The state appeals. Zanter cross-appeals the district court's admission of evidence of workplace harassment of Bloom, Bloom's statements regarding fear and belief of physical threat and Zanter's retrieval of a computer manual at work.

### ISSUES

1. Did the district court clearly err in suppressing:
   a. the receipt?
   b. the photographs?
   c. the car keys and condominium keys?
2. Did the district clearly err in admitting evidence of:
   a. Sharon Bloom's state of mind declarations?
   b. the harassment and the computer manual retrieval?

### ANALYSIS

■ 1. We will reverse a pretrial suppression order only if the state "clearly and unequivocally" establishes that the district court erred and that the order will have "critical impact." *State v. Joon Kyu Kim,* 398 N.W.2d 544, 547 (Minn.1987). Suppression has critical impact if it "significantly reduces the likelihood of a successful prosecution." *Id.* at 551. In addressing the merits of a pretrial appeal, we need not consider critical impact unless error is first demonstrated. *See id.* at 549.[2]

a. *The Receipt.* The investigator who seized the Knox receipt testified on direct examination that correspondence from World Book Encyclopedia was seized "as a means of establishing residency, and we also took a receipt from Knox." The investigator did not testify why he seized the receipt and was unable to recall the location of the receipt in the master bedroom. In its appeal brief, the state argues that the receipt shows Zanter's postcrime movements. At oral argument, the state argued that the receipt shows an opportunity to dispose of Bloom's body early on November 4. Zanter told investigators that he went to 3M briefly at 4:00 or 5:00 a.m. on November 4 and then returned home.

2. We in no way foreclose the possibility that this court could, in any given case, dismiss a pretrial appeal where the information presented to this court by the state evinces a lack of "assurance that [the state] believes critical impact can be demonstrated." *Id.* at 550, n. 10.

The Knox receipt apparently indicates the purchase time to be 8:49 a.m. on November 4.

■ The district court found that "the state argues the receipt was seized as indicia of occupancy" and suppressed it as beyond the scope of the warrant. A search for documents was not authorized by the first warrant. Our review of the record indicates that no reason for the seizure of the receipt was elicited at the omnibus hearing and no factual basis for a plain view analysis was presented. Absent a factual basis in the record of probable cause to support the seizure, the trial court did not clearly err in suppressing the receipt. *See State v. Metz*, 422 N.W.2d 754, 756 (Minn.App.1988) (state bears the burden of showing basis for seizure of item not listed in a warrant); *see also United States v. Clark*, 531 F.2d 928, 932 (8th Cir. 1976).

We note that the exclusion of this evidence, in itself, does not preclude the state from presenting to the jury evidence of Zanter's opportunities and movements during the early morning hours of November 4. We also note that because investigators observed Zanter painting his master bathroom on November 16 and because of the Zanters' admissions that they painted other areas of their home to cover blood stains, the suppression of the receipt only marginally affects the state's allegation that Bloom was attacked in Zanter's home.

■ b. *The Photographs.* The district court determined that although the police lawfully searched Zanter's briefcase, they did not have probable cause to believe that the photographs found in it were stolen. *See Arizona v. Hicks*, 480 U.S. 321, 323, 107 S.Ct. 1149, 1152, 94 L.Ed.2d 347 (1987) (seizure of stereo equipment in plain view during weapons search of an apartment suppressed based on conceded lack of probable cause). Objects not listed in a warrant may be seized if inadvertently discovered during a lawful search where the "incriminating nature of the evidence is immediately apparent." *Clark*, 531 F.2d at 932.

The investigator who seized the photographs testified on cross-examination as follows:

Q. You had a reason to believe they were stolen?

A. I knew that one of the primary issues in our case was theft of property. And I saw a picture of Donna Sommerfeldt, a woman who worked in 3M, so my alarm bells went off and said, these could be stolen.

Q. Follow that out a little, why could they be stolen, realizing, of course, Donna Sommerfeldt didn't think her pictures were stolen at that point in time?

A. That's right. And I had only interviewed Donna Sommerfeldt on one occasion. However, these did not appear to be the appropriate type of photographs that you would find in a businessman's briefcase. We had a sexual crime, and one of these photographs in particular was of a very large breasted woman * * * and I was thinking, well, this is it.

To seize items in plain view "there must be a strong relationship between the seized items and the described items." *State v. Severtson*, 304 Minn. 487, 490, 232 N.W.2d 95, 97 (1975). The evidence must be "immediately facially recognizable as evidence which would connect the defendant" to a crime. *Id.* Given the officer's observations and knowledge, his decision to seize the photographs as stolen property of a 3M coworker was justified. Therefore, we disagree with the district court that the photographs were improperly seized. The question then becomes whether the district court's suppression of the photographs has critical impact upon the state's case.

■ The photographs may support the state's attempt to prove Zanter as Bloom's harasser, or otherwise may be relevant as to opportunity to harass Bloom. Nonetheless, although we agree with the state that relevant evidentiary links in the "chain of circumstances" must be permitted, 11 Peter N. Thompson, *Minnesota Practice* § 401.02, p. 125 (2d ed. 1992), in light of the other evidence admitted and excluded, we do not believe that the suppression of the photographs "significantly reduces the likelihood of a successful prosecution." *Joon Kyu Kim*, 398

N.W.2d at 551. The photographs are too indirect, relative to the alleged murder, to meet the critical impact standard.

■ c. *The Car Keys and Condominium Keys.* The October 1992 recollections of Mrs. Zanter's colleagues created probable cause to test for blood stains and seize "samples of carpet, carpet pad, woodwork, wallboard and flooring materials" in the Zanter home. The warrant application for the third search contained no new information of significance beyond that furnished by Mrs. Zanter's colleagues.[3] Moreover, the absence of keys among the items listed in the second and third warrants suggests that investigators no longer expected to find them.

"[A] gap of two years from the source of the information to the application for a warrant is of great concern." *State v. Jannetta,* 355 N.W.2d 189, 194 (Minn.App.1984), *pet. for rev. denied* (Minn. Jan. 14, 1985). Considering the year and one-half gap here, a comment on staleness is instructive:

> If the search warrant were sought weeks or months after the crime and without more current information tending to show that the stolen property was presently in that place, the judicial officer would be compelled to conclude that probable cause was lacking.

2 Wayne R. LaFave, *Search and Seizure,* § 3.7(a), pp. 75–76 (2d ed. 1987).

Particularly when the crime under investigation is a

> prior murder, rape, burglary, robbery or the like, clearly not a continuing offense, and the desire is to search for the fruits, instrumentalities or evidence of that prior crime, the factor which is likely to emerge as the most important consideration is the nature of the property which is sought. Some objects are likely to be retained by the person committing such an offense for a substantial period, while others are likely to be disposed of promptly.

*Id.* at 82.

The *Jannetta* court allowed admission of photographs previously observed in the possession of a pedophile because of the "narrow circumstances" of an eyewitness account, the expectation of "ongoing criminal sexual conduct," and the "enduring utility" of the photographs for the perpetrator's "sexual gratification." 355 N.W.2d at 194. The two prior unsuccessful searches distinguish the situation here from that in *Jannetta.* Beyond the blood stain information, no new probable cause for a wide-ranging search for "documents" was present on March 5, 1992. *See id.* at 193; *see also* 2 LaFave, at p. 87. The discovery of the keys occurred during searches of drawers in areas of the Zanter home (basement, bedroom, and bathroom) separate from areas where the authorized blood stain testing and carpet seizure took place (stairs and landing). Therefore, the question of plain view inadvertent discovery of the keys does not arise. *See, e.g., Severtson,* 304 Minn. at 490, 232 N.W.2d at 97 (inadvertent discovery of incriminating documents during lawful search of drawer for drugs).

■ The state urges that we apply the so-called "good faith" exception. *See State v. McCloskey,* 453 N.W.2d 700, 701 n. 1 (Minn. 1990) (expressly declining to address adoption of reasonable reliance doctrine of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)). In the absence of an appropriate policy determination by the supreme court, we must decline the state's invitation.

Considering the totality of the evidence, although we disagree with the district court order suppressing the photographs, we affirm because the order does not have critical impact. We also affirm the district court order suppressing, for lack of probable cause, the Knox receipt and the car and condominium keys.

■ 2. A defendant "has no pretrial appeal as of right," and allowance of a cross-appeal is discretionary. *See Kim,* 398 N.W.2d at 550, n. 8 (citing Minn.R.Civ.P. 28.04, subd. 3). However, because the issues on cross-appeal are "important, fully briefed,

---

**3.** In the third search warrant application, allegations of a theft of a wallet from a female coworker at Zanter's new workplace lacked any facts to connect Zanter to the theft and created no probable cause to search Zanter's house for the wallet or its contents.

**58**

and documented by a well-developed record," in our discretion we briefly address Zanter's challenge to the admission of three types of evidence. *Metz*, 422 N.W.2d at 756.

■■■ a. *State of Mind Declarations.* Zanter challenges those portions of Bloom's statements to friends and colleagues regarding the harassment in which she expressed fear for her safety and an apparent belief that the harassment was becoming physically threatening. The district court admitted Bloom's statements in general regarding the harassment based on the "consistency of Ms. Bloom's statements to different people" as "equivalent circumstantial guarantees of trustworthiness" under Minn.R.Evid. 804(b)(5). *See, e.g., State v. Langley,* 354 N.W.2d 389, 398 (Minn.1984). A murder victim's fear of a defendant is only admissible where the victim's state of mind is relevant, for instance, "where the defendant raises the defense of accident, suicide or self-defense." *State v. Blanchard,* 315 N.W.2d 427, 432 (Minn.1982); *see also* Minn.R.Evid. 804(b)(5). These particular defensive circumstances are not present in this case. The reason for the limited admissibility is

> "the risk that the jury will consider the victim's statements of fear as a true indication of a defendant's intentions or actions," *Campbell v. United States,* 391 A.2d 283, 287 (D.C.App.1978).

*Blanchard,* 315 N.W.2d at 432.

We find *Blanchard* distinguishable. Bloom expressed fear of an anonymous harasser; she went only so far as telling her friends that she had her suspicions regarding the identity of the harasser. We will not disturb the district court's determination based upon the challenges presented.

■■ b. *Harassment Evidence and Computer Manual Retrieval.* The trial court ruled that the acts of harassment and the computer manual retrieval were admissible, *see generally State v. Salas,* 306 N.W.2d 832, 836 (Minn.1981) (motive, relationship), but subject to reexamination under Minn.R.Evid. 403 at trial. Beyond noting the potential admissibility of this evidence on a narrow basis under *Salas,* we decline to address this

evidence because the district court reserved final ruling on admissibility under rule 403.

### DECISION

The district court did not clearly err in excluding the keys and Knox receipt. The order suppressing the photographs lacks critical impact. The district court did not clearly err in declaring generally admissible the victim's statements regarding the harassment.

**Affirmed.**