STATE of Minnesota, Petitioner, Appellant,

v.

**Stephan James ZANTER, Respondent.**

No. C7–93–2585.

Supreme Court of Minnesota.

Aug. 4, 1995.

Reconsideration Denied Sept. 20, 1995.

Hubert H. Humphrey, III, Atty. Gen., St.
Paul, and Jeffrey D. Thompson, Rice County
Atty., Faribault, and Robert R. King, Jr.,
Charles E. Maclean, Asst. Rice County At-
tys., Dakota County Cths., Hastings, for ap-
pellant.

Joseph S. Friedberg, Minneapolis, and
Paul Engh, Foshay Tower, Minneapolis, for
respondent.

Gina G. Washburn, Executive Director,
MN County Attys. Ass'n, Hubert H. Hum-
phrey, III, Atty. Gen., Robert A. Stanich,
Asst. Atty. Gen., St. Paul, for amici curiae
MN County Attys. and MN Atty. Gen.

Mark S. Wernick, Minneapolis, for amicus
curiae MN Ass'n. of Crim. Defense Lawyers.

Lawrence Hammerling, Deputy State Pub-
lic Defender, Minneapolis, for amicus curiae
MN State Public Defender.

## OPINION

ANDERSON, Justice.

This matter comes before us on a pretrial appeal by the state pursuant to Minn. R.Crim.P. 28.04. The appeal is from the trial court's omnibus order suppressing two pieces of evidence seized by police during two separate warranted searches of defendant Stephan Zanter's home in Eagan, Minnesota. The Rice County Grand Jury has indicted Zanter on one count of first-degree murder and on three counts of second-degree murder in connection with the disappearance and murder of Sharon Bloom. In its omnibus order, the court suppressed a number of photographs that police had found in a briefcase during their first warranted search of Zanter's home. Although police discovered the photographs in "plain view," the court suppressed the photographs because it concluded that the seizing officers did not have reason to believe that the photographs were incriminating. The court also suppressed a set of keys that police had found in the bottom drawer of a dresser located in the basement of Zanter's home. The keys were seized during a third warranted search of Zanter's home. The court suppressed the keys on the ground that the parts of the third warrant authorizing police to look in the dresser were not supported by probable cause. The Minnesota Court of Appeals affirmed the decision of the trial court, but on different grounds with respect to the photographs. We granted review, and we affirm in part and reverse in part.

In November 1989, Sharon Bloom was employed as a systems analyst by 3M at its Woodbury, Minnesota facility. At approximately 11:30 a.m. on November 2, 1989, Bloom disappeared from the Woodbury facility. Ten days later, on November 12, 1989, a farmer found Bloom's partially clad body in a cornfield in Rice County, about halfway between the cities of Northfield and Faribault, Minnesota. Bloom had been bludgeoned to death and appeared to have been the victim of a sexual assault.

Bloom was last seen near the front entrance of the building in which she worked. The police interviewed Bloom's co-workers, family and friends, and learned that Bloom had been subject to numerous incidents of harassment while working at 3M. More particularly, her keys had been taken on at least four occasions and were never returned; her glasses had been taken and were later discovered in an area that had already been searched; her presentation materials had been taken and were later returned to her locked desk after the presentation; and on one occasion a large amount of coffee had been spilled on her chair, requiring her to go home to change her clothing. The harassment had been on-going for more than a year. Bloom's co-workers and friends knew of the harassment, and several individuals indicated that shortly before her disappearance, Bloom expressed concern for her personal safety. The harasser had not been identified, although several people, including Bloom, mentioned Stephan Zanter as a possible suspect. Zanter was Bloom's long-time co-worker and had formerly occupied Bloom's desk at 3M.

In the days following Bloom's disappearance, the police were able to verify an alibi for Bloom's boyfriend and alibis for all but one of her co-workers—Stephan Zanter. On the evening of November 12, 1989, Ray DiPrima, an agent with the Bureau of Criminal Apprehension (BCA), and David Hines, an investigator with the Woodbury police department, went to Zanter's home to interview him and to inquire into his alibi. Zanter's wife, Barbara, was present for the interview, and Zanter's daughter was also present for the first half of the interview, which ultimately lasted approximately 4.5 hours. During the interview, Zanter acknowledged that he was aware of the harassment of Bloom. He also acknowledged that some of his co-workers considered him to be a suspect in the harassment, although he denied that he was the harasser.

Zanter offered the following alibi for the day Bloom disappeared. He told the officers that on November 2, 1989, he was working at the 3M facility. He left work at approximately 11:00 a.m. and drove to the 3M em-

ployee store in Maplewood, Minnesota to purchase some unidentified items. He left the 3M store without making a purchase. He then drove to a Burger King restaurant for lunch. Zanter reported that, shortly after leaving Burger King, his car broke down along a busy street. He waited for an unknown period of time before an unidentified motorist stopped to help jump-start his car. Zanter remembered that the individual who helped him was a male, but he could not identify the helper's age, race or appearance, or the type of car he drove. After his car started, Zanter stated that he returned home because he was cold. At approximately 2:00 p.m., Zanter called 3M to inform his supervisor that he would not be returning to work that day. Zanter stated that he spent the remainder of the afternoon at his home.

Approximately three to four hours into the interview with Zanter, DiPrima was paged and he telephoned his office from the Zanter home. He learned that Bloom's body had been found. After DiPrima consulted with Investigator Hines, the two officers told Zanter that Bloom's body had been found. At that point, Zanter became emotionally distraught. He first stated that he had hoped that Bloom would not be found. Zanter's wife immediately clarified that her husband meant that they both had hoped that Bloom would not be found dead. Zanter then began to sob and to moan, and he eventually curled into a "fetal position" on the floor. Zanter's wife became concerned and asked the officers not to leave. At one point, Zanter asked the officers whether they were going to take him to jail. Investigator Hines responded by asking whether there was a reason the officers should take Zanter to jail. Zanter did not directly answer the question. Both officers testified they found Zanter's behavior to be highly unusual. The two officers eventually left without arresting Zanter.

On November 16, 1989, the police applied both for a search warrant for Zanter's home and for a warrant to take blood and hair samples from Zanter's body. The affidavit in support of the warrants set forth evidence that, among other things, Zanter was a suspect in the harassment of Bloom; the police were unable to verify Zanter's alibi; and

Zanter acted in an unusual manner upon learning that Bloom's body had been discovered. A search warrant was issued for the home on November 16, authorizing the police to search for and to seize:

> clothing and personal affects [sic] belonging to or owned by Sharon Phyllis Bloom, including a skirt; shoes; underwear; a gray and brown purse and its contents including a calendar, address book, identification, keys and credit cards; a heavy blunt metal object indicating the presence of hair, blood, or bodily fluids; samples of hair, blood, bodily fluids, and possible finger prints of Sharon Phyllis Bloom.

When the police executed the warrant, Zanter was painting his master bathroom. The Zanters had recently moved into the newly-built home. During the search, the police seized several items, including photographs found in Zanter's briefcase. Although the photographs were not explicitly sexual, many were of women in bathing suits and several were of women sitting on the toilet. Agent DiPrima immediately recognized one of the women in the photographs as being a co-worker of Bloom and Zanter. Neither Zanter nor any member of his family were in any of the photographs. DiPrima seized the photographs because he suspected they were stolen and were related to the alleged harassment at 3M. Although the photographs were apparently stolen, the police did not confirm this until after they seized them and subsequently showed them to the female co-worker.

During the first search, the police did not test the house for blood or other trace evidence. The mobile BCA crime lab was not on the scene because it was occupied with another case. Moreover, because the police had removed what they thought to be seminal material from Bloom's body, they believed that they would be able to compare DNA in that material with samples of Zanter's DNA. But no semen was actually found in the material removed from Bloom's body.

On September 5, 1990, nearly ten months after the first search, the police sought a second search warrant for the Zanter home. The affidavit in support of the warrant incor-

porated by reference the prior affidavit in support of the November 16, 1989 warrant. The affidavit also set forth additional evidence that focused suspicion on Zanter, including: preliminary conclusions by the BCA lab indicated that a head hair and a pubic hair found with Bloom's body were microscopically similar to known samples taken from Zanter on November 16, 1989; Zanter had been painting his master bathroom when the police executed the first warrant; "luminol" testing had in the past been successful in revealing trace blood on painted walls; the photographs seized during the first search had been confirmed to be stolen; Zanter's car battery showed no signs of having been recently connected to cables used to jump-start a car; and other inconsistencies existed in Zanter's alibi.

The second search warrant was issued on September 5, 1990. It authorized the police to search for and to seize:

> Evidence relating to the cause, matter, or motive in the death of Sharon Phyllis Bloom including hairs, blood, clothing, fibers and fingerprints; any weapons or instruments which could cause blunt force trauma; and documents, records, notes, correspondence, which could be used to establish a motive for homicide, including bank records, checks and credit card account statements.

On September 6, 1990, police officers and BCA lab personnel executed the second search warrant. They used the luminol testing procedure in an attempt to find trace blood on the painted walls. These tests failed to reveal trace blood. The police also conducted a second exhaustive search of the Zanter home. The police did not arrest Zanter after this second search.

In February 1992, more than two years after Bloom's murder, Agent DiPrima interviewed several of Barbara Zanter's co-workers. Some of them recalled that on November 3, 1989, the day after Bloom disappeared, Barbara Zanter was distracted at work because on the previous day she had found freshly spilled blood on the carpet and walls of her new home. Barbara Zanter asked her co-workers for suggestions on how to remove blood stains from carpet.

Armed with this new information, the police sought a third search warrant. The affidavit in support of the warrant incorporated the information contained in the first and second warrant applications. The only new information contained in the supporting affidavit was that Barbara Zanter had discussed with her co-workers the existence of blood in her home on the day Bloom disappeared, and that a co-worker at Zanter's new job at the University of Minnesota had reported her wallet stolen.

On March 4, 1992, a third search warrant was issued and the police executed it on March 5, 1992. This warrant authorized the police to search for and to seize:

> Evidence relating to the cause, matter, or motive in the death of Sharon Phyllis Bloom including hairs, blood, clothing, fibers and fingerprints; any weapons or instruments which could cause blunt force trauma; and documents, records, notes, photos, correspondence, which could be used to establish a motive for homicide, including bank records, checks and credit card account statements; to include samples of carpet, carpet pad, woodwork, wallboard and flooring materials.

The warrant was executed at night and the Zanters were displaced from their home overnight while the police conducted their search. During the search, the police found evidence of blood on the underside of carpet in the Zanter home. But subsequent tests did not reveal the origin of the blood stains.

In addition to performing tests for blood, agent DiPrima and other officers conducted an exhaustive search of the home, lasting approximately six hours. This was the third full search of the Zanter home. During this search, the police seized a set of keys that they found in the bottom drawer of a dresser located in the basement. One of the keys was for a Honda automobile. The police subsequently determined that the keys belonged to Bloom. The keys were for her car and for her previous residence. Because at the crime scene the police had found the keys Bloom had with her on the day she disappeared, they concluded that the keys found in Zanter's basement were probably some of

the keys allegedly taken as part of the on-going harassment of Bloom.

On October 23, 1992, the Rice County Grand Jury met in connection with the disappearance and murder of Sharon Bloom and indicted Stephan Zanter for one count of first-degree murder and for three counts of second-degree murder.

On August 12, 1993, following a lengthy omnibus hearing, the trial court filed its Findings of Fact, Conclusions of Law and Omnibus Order. The court suppressed many items taken during the three searches, including the photographs and Bloom's keys. The Minnesota Court of Appeals affirmed the decision of the trial court, but on different grounds with respect to the photographs. The court of appeals held that the police had sufficient reason to believe that the photographs were evidence of a crime, and the police therefore had probable cause to seize them. Notwithstanding this conclusion, the court of appeals also held that the state had not met its pretrial burden of showing that suppression of the photographs would have a "critical impact" on the state's ability to prosecute Zanter successfully. Therefore, the court of appeals affirmed the trial court's suppression of the photographs. *State v. Zanter*, 518 N.W.2d 52, 56–57 (Minn.App. 1994). With respect to the keys, the court of appeals agreed with the trial court that "no new probable cause" existed for the parts of the third warrant that authorized the police to search the dresser in which they found the keys. The court of appeals therefore affirmed the suppression of the keys. *Id.* at 57. We granted the state's petition for review.

## I.

■ The state may appeal pretrial orders in felony cases. *See* Minn.R.Crim.P. 28.04. To prevail, the state must "clearly and unequivocally" show both that the trial court's order will have a "critical impact" on the state's ability to prosecute the defendant successfully and that the order constituted error. *See State v. Joon Kyu Kim*, 398 N.W.2d 544, 547 (Minn.1987) (citing *State v. Webber*, 262 N.W.2d 157 (Minn.1977)).

■ In the present case, the court of appeals held that "[t]he photographs are too indirect, relative to the alleged murder, to meet the critical impact standard." *Zanter*, 518 N.W.2d at 57. We disagree. Although the court of appeals failed to address the issue, we further conclude that suppression of the keys meets the critical impact standard.

At trial, the state will apparently seek to introduce both the photographs and the keys as *Spreigl* evidence to identify Zanter as Bloom's harasser. *See* Minn.R.Evid. 404(b) (stating that evidence of another crime, wrong, or act is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"). We note that the trial court has preliminarily ruled to allow as *Spreigl* evidence an allegation that Zanter admitted to another female co-worker that he took a computer manual from the co-worker's desk without her permission. Pursuant to the court's omnibus order, however, the admissibility of evidence relating to that alleged theft is subject to re-examination under Minn.R.Evid. 403 (providing that relevant evidence may be excluded for various reasons). We give no opinion as to whether either the photographs or the keys are proper *Spreigl* evidence or whether under Minn.R.Evid. 403 the probative value of either the photographs or the keys is outweighed by the danger of unfair prejudice to Zanter.

■ Critical impact is necessarily a demanding standard, but it is a fair and workable rule. *See Joon Kyu Kim*, 398 N.W.2d at 551. Critical impact has been shown when "the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution." *Id.* Whether suppression of a particular piece of evidence will significantly reduce the likelihood of a successful prosecution depends in large part on the nature of the state's evidence against the accused. For example, in *State v. Edwards*, we held that suppression of the admissible hearsay statements of a young victim of a sexual assault, when the victim was incompetent to testify by reason of her young age, clearly would have a critical impact on the state's ability to prosecute her attacker. 485

N.W.2d 911, 914 (Minn.1992). Similarly, we have held that suppression of a defendant's confession will have a critical impact on the prosecution's case. *State v. Ronnebaum,* 449 N.W.2d 722, 724 (Minn.1990); *State v. Anderson,* 396 N.W.2d 564, 565 (Minn.1986).

In the present case, neither the photographs nor the keys appear to be as critical to the state's case as the statements of an unavailable victim or the confession of a criminal defendant. In this case, the state may choose to offer the photographs or the keys as circumstantial evidence of, for example, Zanter's identity as Bloom's harasser or as circumstantial evidence of his motive to kill her. Offered as such, neither the photographs nor the keys provide direct evidence of Zanter's guilt or innocence. Viewed in isolation from the remainder of the state's evidence, neither the photographs nor the keys appear to be critical to a successful prosecution. But to fully appreciate the impact that suppressing these items will have on the state's case, we must consider the state's evidence as a whole.

■■■ The state's evidence against Zanter is circumstantial. In deciding whether the evidence presented at a criminal trial is sufficient to support a conviction, we normally accord circumstantial evidence the same weight as direct evidence. But, if a jury conviction is based solely on circumstantial evidence, "the circumstances proved must be consistent with the hypothesis that the defendant is guilty and inconsistent with any other rational hypothesis other than guilt." *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992) (citing *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988)). Under such a standard, each piece of circumstantial evidence that forms a link in the chain of the prosecution's case can be critical to the outcome of the trial because the loss of one link may prevent the state from meeting its evidentiary burden. *See* 11 P. Thompson, *Minnesota Practice* § 401.02, at 125 (2d ed. 1992) ("An attorney presenting a case based on circumstantial evidence must be permitted to introduce evidence tending to establish each link in the chain of circumstances pointing to a favorable conclusion.").

Given the circumstantial nature of the state's evidence against Zanter, we conclude that the state's ability to establish both Zanter's identity as Bloom's harasser and his motive to kill her are an essential part of the state's theory of the case. Therefore, suppression of either the photographs or the keys will have a critical impact on the likelihood of a successful prosecution.

## II.

Having concluded that suppression of either the photographs or the keys will have a critical impact on the state's ability to prosecute Zanter successfully, we now must decide whether the trial court erred in concluding that the police impermissibly seized both the photographs and the keys. *See Joon Kyu Kim,* 398 N.W.2d at 547.

### A. *Photographs*

■■■ We first address the seizure of the photographs. The photographs were seized during the execution of the first search warrant for the Zanter home. Under the "plain view" exception to the warrant requirement, the police may, without a warrant, seize an object they believe to be the fruit or instrumentality of a crime, provided: "(1) [the] police are legitimately in the position from which they view the object; (2) they have a lawful right of access to the object; and (3) the object's incriminating nature is immediately apparent." *State v. Dickerson,* 481 N.W.2d 840, 844–45 (Minn.1992) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)), *affirmed,* —— U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). In deciding whether the plain view exception justifies the seizure of the photographs in the present case, the only issue before this court is whether the police had sufficient probable cause to believe that the photographs were of an incriminating nature.

■■■ In *Arizona v. Hicks,* the United States Supreme Court held that the police must have probable cause to seize items they discover in plain view. 480 U.S. at 326, 107 S.Ct. at 1153. A reasonable suspicion on the

part of police is insufficient to invoke the plain view exception. *Id., cited in State v. DeWald,* 463 N.W.2d 741, 747 (Minn.1990). The police have probable cause to seize items in plain view when " 'the facts available to the officer would warrant a [person] of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of crime.' " *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983), *quoted in DeWald,* 463 N.W.2d at 747. Moreover, "in determining whether the stolen nature of the property * * * is immediately apparent, the police may consider such things as any background information they have which casts light on the nature of the property * * *." *State v. Smith,* 261 N.W.2d 349, 352 n. 2 (Minn.1977), *quoted in DeWald,* 463 N.W.2d at 747.

In the present case, the trial court held that the police did not have probable cause to seize the photographs because the police did not know that they were stolen. We disagree. Although we consider the court's analysis to be thorough, we nonetheless conclude that the court erred in suppressing the photographs.

Agent DiPrima testified that, at the time he seized the photographs, he was aware of the alleged harassment of Sharon Bloom at 3M and he immediately recognized that a female co-worker of Zanter and Bloom was depicted in some of the photographs. He also immediately noted that the majority of the photographs were of women, some of the photographs were in his opinion inappropriate, and no members of the Zanter family were depicted in the photographs. Based on these facts, Agent DiPrima testified that he suspected that the photographs were stolen and that they were possibly related to the alleged harassment at 3M. Agent DiPrima has acknowledged that he did not know that the photographs were actually stolen at the time he seized them.

We conclude that the existence of these facts gave Agent DiPrima sufficient probable cause to believe that the photographs would be useful as evidence of crime. *See DeWald,* 463 N.W.2d at 747. The background information available to the police at the time

they executed the first warrant, including the probable murder and probable sexual assault of Bloom, the alleged harassment at 3M and the familiarity with Bloom's co-workers, when added to the facts observed during the search, would have led a reasonable police officer to conclude that the photographs were incriminating. This is particularly true in a case such as this in which the items seized in plain view appear to be related to the crime under investigation.

We hold that suppression of the photographs will have a critical impact on the state's ability to prosecute Zanter successfully and that the photographs are admissible pursuant to the plain view exception.

### B. *Keys*

▮▮▮▮ We next address the suppression of Bloom's keys, which the police seized from the dresser in Zanter's basement during execution of the third warrant. Although the third warrant did not specifically mention the keys on its face, it did authorize the police to search for a number of items that could have been found in the dresser drawer in which the police found the keys. *See State v. Thisius,* 281 N.W.2d 645, 646 (Minn.1978) (holding that it was permissible for officers to search locked metal box of sufficient size and weight, which they reasonably believed might contain items listed in search warrant). Therefore, admission of the keys would probably be permissible under the plain view exception to the warrant requirement. *See Dickerson,* 481 N.W.2d at 844–45 (listing plain view requirements). But because the admissibility of evidence seized in plain view rests on the validity of the initial search, we must first determine whether those parts of the third warrant that authorized the police to search for items that may have been contained in the dresser were supported by probable cause. *See State v. Hoven,* 269 N.W.2d 849, 853 (Minn.1978).

The trial court held that probable cause existed for only that part of the third warrant that authorized the police to search for evidence of blood and to seize from the Zanter home "samples of carpet, carpet pad, woodwork, wallboard and flooring materi-

al."[1] The court therefore severed the warrant, a process we approved in *State v. Hannuksela*, 452 N.W.2d 668 (Minn.1990). As a result, the court held that the police improperly seized the keys because they did not provide new information to indicate that probable cause existed to search the dresser in which the keys were found. The court of appeals affirmed. *Zanter*, 518 N.W.2d at 57. We also affirm.

■■■■■ Minnesota has adopted a "totality of the circumstances" test for determining whether a search warrant is supported by probable cause. *State v. Wiley*, 366 N.W.2d 265, 268 (Minn.1985) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Determinations of probable cause by the issuing judge are afforded "great deference" by this court and are not reviewed *de novo*. *Wiley*, 366 N.W.2d at 268. The issuing judge "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, *cited in Wiley*, 366 N.W.2d at 268. As the reviewing court, we are simply to ensure that the issuing judge had a "substantial basis" for concluding that probable cause existed. *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332, *cited in State v. McCloskey*, 453 N.W.2d 700, 702–03 (Minn.1990).

The hearsay information provided by Barbara Zanter's co-workers, which indicated that Barbara Zanter had found blood on the carpet and walls of her home the day Bloom disappeared, gave the police probable cause to obtain a warrant to search for evidence of blood on the walls and carpet and to seize "samples of carpet, carpet pad, woodwork, wallboard and flooring materials." Given the totality of the circumstances surrounding the affidavit accompanying the third warrant application, including the "veracity" and "basis of knowledge" of the co-workers who sup-

plied the hearsay information, we conclude that a fair probability existed that evidence of a crime—the blood of a murder victim— would be found on the walls, carpet or floor material of the Zanter home.

The search for evidence of blood was strictly limited to the wall, carpet and floor materials specifically described in the warrant. The part of the third warrant that authorized the police to search for evidence of blood did not permit a search of the dresser in the Zanter basement. Therefore, we must address whether the remaining parts of the warrant, which under the plain view exception may have authorized the police to search the dresser for items enumerated in the warrant, were supported by probable cause. Because we conclude that the police failed to provide new information to justify an exhaustive third search of the home for evidence other than evidence of blood on walls, carpet or floor material, we also conclude that all other items seized pursuant to the third warrant, including the keys, are inadmissible.

In reviewing the sufficiency of a warrant application, the issuing judge must be particularly attentive in a case such as this in which almost all of the information offered in support of the current warrant application is not new, and in fact was used to justify two previous, exhaustive searches of the same residence. This is especially true when the warrant seeks items previously sought, but not found, during prior searches. Once the police have engaged in an exhaustive search of a particular place, they cannot expect to re-search that area at a later date without providing the issuing judge with new information sufficient to indicate that items sought, but not found, during prior searches will now be found. In such situations, the issuing judge must take particular care to separate the information that supported previous warrants from the new information that supports the current warrant application.

In the present case, the entire third warrant authorized the police to search for and to seize:

---

1. We note that the judge who presided over the omnibus hearing was not the judge who issued

the third warrant.

Evidence relating to the cause, matter, or motive in the death of Sharon Phyllis Bloom including hairs, blood, clothing, fibers and fingerprints; any weapons or instruments which could cause blunt force trauma; and documents, records, notes, *photos,* correspondence, which could be used to establish a motive for homicide, including bank records, checks and credit card account statements; *to include samples of carpet, carpet pad, woodwork, wallboard and flooring materials.*

(Emphasis added.) Except for the emphasized parts, the language of this third warrant is identical to the second warrant. Before the police applied for the third search warrant, they had thoroughly searched the Zanter home on two separate occasions.[2] In the affidavit that the police submitted in support of the third warrant, the only new information they provided that was not contained in the affidavits supporting the two prior warrants was that Barbara Zanter had told her co-workers that she had found blood on the carpet and walls of her home the day that Bloom had disappeared.[3] Otherwise, the police provided no new information that would indicate that incriminating "photos" would be found in the Zanter home[4] or that items already searched for during two prior, exhaustive searches of the home would now be discovered during a third search.

As a result, the police failed to provide the issuing judge with sufficient new information that could have led the judge to conclude that a fair probability existed that other enumerated items not discovered during the two previous, exhaustive searches of the Zanter

home would now be discovered during a third search. Under these circumstances, we cannot conclude that the issuing judge had a "substantial basis" for concluding that probable cause existed to search the Zanter home for anything other than evidence of blood on walls, carpet or floor material.

▬ Although we conclude that suppression of the keys will have a critical impact on the state's ability to prosecute Zanter successfully, we affirm the suppression of the keys because the police seized the keys pursuant to parts of the third warrant that were not supported by probable cause.

The state has asked us to adopt a "good faith" exception to the warrant requirement of article I, section 10 of the Minnesota Constitution. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that evidence seized pursuant to a facially valid warrant that is later found to be lacking in probable cause is not subject to exclusion under the Fourth Amendment if the police obtained the warrant in good faith). But, because under the specific facts of the present case we believe that the good faith of the police, which we do not question, cannot cure the clear insufficiency of the third warrant application, we decline at this time to address the applicability of a good faith exception. Our decision to suppress the keys is based exclusively on article I, section 10 of the Minnesota Constitution, which provides in part that warrants shall issue only upon a showing of probable cause.

We reverse that part of the decision of the courts of appeals holding that suppression of

2. In his testimony, agent DiPrima admitted that the first two searches were exhaustive, and he acknowledged on cross-examination that what the police did during those two searches is referred to in their trade as a "toss the house."

3. The affidavit also stated that a co-worker at Zanter's new place of employment had reported her wallet stolen. The state has failed to explain how such a broad statement, which provides absolutely no evidence indicating that Stephan Zanter took this wallet or that it would be found in his home, has any relevance to the murder of Sharon Bloom.

4. The trial court incorrectly concluded that the affidavit supporting the third warrant indicated for the first time that the police had confirmed

that the photographs were stolen. We cannot, however, completely fault the court for making this error. Although nothing in the record indicates that the police intended to mislead the judge who issued the third warrant, we do note that the information confirming that the photographs were stolen appeared in paragraph 17, the last numbered paragraph of the affidavit supporting the second search warrant application. That verbatim paragraph appears as paragraph 20, again the last numbered paragraph, of the affidavit in support of the third search warrant application. The positioning of paragraph 20 in the third warrant application could give the erroneous impression that it contains new information, which of course it does not.

the photographs will not have a critical impact on the state's ability to prosecute Zanter successfully. We affirm those parts of the decision of the court of appeals holding that the photographs are admissible pursuant to the plain view exception to the warrant requirement and that the keys are inadmissible because they were seized pursuant to invalid parts of the third warrant.

Affirmed in part and reversed in part.