*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-0742**

State of Minnesota,
Appellant,

vs.

Derrick Rayshon Mays,
Respondent.

**Filed November 17, 2025
Reversed and remanded
Worke, Judge**

Olmsted County District Court
File No. 55-CR-25-1191

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Michael T. Walters, Olmsted County Attorney, James E. Haase, Senior Assistant County Attorney, Rochester, Minnesota (for appellant)

Anders J. Erickson, Johnson Erickson Criminal Defense, Minneapolis, Minnesota (for respondent)

Considered and decided by Slieter, Presiding Judge; Worke, Judge; and Bratvold, Judge.

**NONPRECEDENTIAL OPINION**

**WORKE**, Judge

In this pretrial appeal from the district court's order suppressing evidence and dismissing a firearm-possession charge, the state argues that the search of the vehicle was reasonable in the interests of officer and public safety. We agree, and reverse and remand.

# FACTS

The facts are derived from the omnibus-hearing transcript and Officer Mueller's body-worn-camera footage.

On February 9, 2025, N.B. called the police requesting a welfare check on her daughter, D.P. She reported that D.P. is in an abusive relationship with respondent Derrick Rayshon Mays. N.B. stated that Mays has a violent history and has a firearm. She reported that Mays "pistol-whipped" D.P., "beat[s] on her," and "will not let her out of his sight." N.B. reported previously observing bruising on D.P.'s face. N.B. was "very concerned" because the abuse harmed D.P.'s well-being. N.B. stated that Mays and D.P. were at a certain hotel and described a vehicle that they drove.

Officer Mueller confirmed that Mays has a violent history with "people out in the community [and] with the Rochester Police Department." Because Mays is considered "potentially in possession of a firearm," the police department created a "bright red alert for officer safety reasons."[1] Officer Mueller also confirmed that Mays is ineligible to possess a firearm and has a revoked driver's license.

Officer Mueller observed the vehicle N.B. described at a stop sign facing him. The officer recognized Mays driving the vehicle. When Mays looked at the officer, he turned eastbound onto a different road. The officer followed, intending to stop the vehicle to conduct a welfare check on D.P. Officer Mueller observed Mays tilt his body down toward the passenger side and slow down. The officer activated his emergency lights and Mays

---

[1] The Rochester Police Department created a "bright red alert for officer safety reasons" in their system based on a previous call involving Mays.

abruptly stopped in the middle of the road, opened the driver's door, and began to step out of the vehicle.

Officer Mueller pulled up behind the stopped vehicle. Officer Mueller's body-worn camera recorded the interaction. Officer Mueller initially told Mays to return to his vehicle because he was parked in the middle of the road. Mays "yell[ed] and scream[ed] and [said] that [the officer] had no reason to stop him." Officer Mueller attempted to move Mays out of the way of traffic. Mays's response was "aggressive" and "verbally combative." Mays was "swinging his arms, clenching his fists, [and] saying that he [was] going to die." The officer walked toward the driver's side of the vehicle intending to "conduct a protective sweep," but when Mays came up behind him, the officer continued focusing on keeping Mays out of the traffic flow.

Officer Mueller next asked Mays if he had any weapons on him. Mays replied: "No, why the f--k would I." Mays asked if he was under arrest. Officer Mueller told Mays that he was "about to be detained" because he was not cooperating. The officer stated that he was going to subject Mays to a pat-down search. Mays continued to yell and said: "Bro, try to put your b---h ass hands on me I'm gonna die today, dog!" The officer conducted a pat-down search but did not find anything on Mays's person.

When other officers arrived, Officer Mueller talked to D.P., who was in the passenger seat of the vehicle. D.P. had marks on her face, including "dark blue bruising on her chin." D.P. told the officer that one of her friends left the bruise on her face. The officer asked D.P. if there were weapons in the vehicle. He also asked, "Why would someone tell me that there might be a weapon somewhere?" D.P. replied: "[Be]cause he's

known to have weapons." D.P. stated that there were no weapons in the vehicle. The officer told D.P. that he could help her if she was in a domestic situation. D.P. denied that Mays put his hands on her but stated that she wanted him to get help and that she was tired and not alright.

Officer Mueller returned to the rear of the vehicle where Mays had "escalated with the other officers as they were trying to control him from moving into traffic." A sergeant was concerned about moving the vehicle. Officers allowed Mays to enter the passenger side of the vehicle; D.P. moved the vehicle to a safer location.

Officer Mueller again spoke with Mays, who had calmed down. The officer told Mays that he was going to cite Mays for driving after revocation. He asked Mays and D.P.: "What's the plan for the rest of the day – are you guys both safe?" Officer Mueller then walked back to his squad vehicle and his body-worn camera stopped recording.

When the officer returned to Mays's vehicle, his body-worn camera began recording again. The officer asked Mays and D.P. to exit the vehicle so that he could conduct a protective sweep for weapons. Mays became aggressive again. During the protective sweep, the officer found a handgun in the unlocked glove box.

Appellant State of Minnesota charged Mays with ineligible person in possession of a firearm and interfering with a peace officer. Mays moved to suppress the firearm and dismiss the charges. At a contested omnibus hearing, Mays argued that the officer unreasonably expanded the stop by searching the vehicle after the officer told Mays that he would only be ticketing him for driving after revocation. The state countered that the search was a valid protective sweep.

4

Officer Mueller testified about N.B.'s call that initiated the welfare check. He also testified about his investigation into Mays's history with law enforcement. Officer Mueller testified that, based on his training and experience, Mays's furtive movement in the vehicle and exiting the vehicle in the middle of the road were abnormal. Mays approaching the officer from behind made the officer feel "very uncomfortable." Officer Mueller testified that he was prevented from "conduct[ing] a protective sweep" of the vehicle as planned at the beginning of the stop because Mays "was aggressively not letting [the officer] control the situation." The officer testified that "[Mays] was controlling the situation." The officer did not initially have back-up. He described the situation "[a]s an officer [to be] very unsafe." Officer Mueller also testified that, although D.P. stated that she was fine and did not want to talk, it was apparent that "some type of assault or abuse" was taking place.

Officer Mueller testified that he did not support the sergeant's decision to move the vehicle because he wanted to "conduct the rest of his investigation right there," which would have included a protective sweep of the vehicle. Officer Mueller "continu[ed] the stop" after D.P. moved the vehicle because he "had not finished any of [his] business with [Mays]." Officer Mueller testified that, after he told Mays that he would be citing him for driving after revocation, he returned to his squad car, described the full situation to his sergeant, and explained that he was uncomfortable because he had not conducted a protective sweep. After speaking with his sergeant, the officer conducted the protective sweep of the vehicle.

The district court granted Mays's motion to suppress the firearm and dismiss the charges.[2]  The district court stated that there was no dispute that the initial stop was legal given "Officer Mueller's knowledge of [Mays]'s revoked driving status and observation of [Mays] driving, as well as the request for a welfare check."  But the district court concluded that the protective-search exception to the warrant requirement did not provide a basis for the vehicle search because Officer Mueller had performed a pat-down search of Mays.  The district court determined that the search of the vehicle was not supported by the original suspicion because concerns for officer safety "had dissipated by the time of the vehicle search."  The state's appeal of the suppression order followed.

**DECISION**

In this pretrial appeal, to be entitled to review of the district court's order, the state must first establish, "clearly and unequivocally," that the district court's ruling will have a "critical impact" on the state's ability to prosecute the unlawful-firearm-possession charge. *State v. Zanter*, 535 N.W.2d 624, 630 (Minn. 1995) (quotation omitted).  "Critical impact has been shown when the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution."  *Id.* (quotation omitted).  Because the district court's order resulted in dismissal of the charge, the state has demonstrated critical impact on its ability to prosecute.  *See State v. Lugo*, 887 N.W.2d 476, 482 (Minn. 2016).

The state argues that the district court erred by suppressing the firearm because it was found during a protective sweep that was reasonable under the original purpose of the

---

[2] The district court later reinstated the interfering-with-a-peace-officer charge.

6

stop. Mays counters that, although the original stop was justified, the officer unreasonably expanded the search because any concerns about officer safety were dispelled after the pat-down search and the issuance of the citation.

This court reviews the district court's factual findings in its pretrial suppression order for clear error and its legal determinations de novo. *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008).

The United States and Minnesota Constitutions prohibit "unreasonable searches and seizures." U.S. Const. amend. IV; Minn. Const. art. 1, § 10. Generally, evidence obtained during an unconstitutional search or seizure must be suppressed. *State v. Diede*, 795 N.W.2d 836, 842 (Minn. 2011). But a police officer may "temporarily seize a person to investigate that person for criminal wrongdoing if the officer reasonably suspects that person of criminal activity." *Id.* (quotation omitted). Reasonable suspicion exists when an officer has specific, articulable facts that provide an "objective basis for suspecting the seized person of criminal activity." *Id.* at 842-43 (quotation omitted). The reasonable-suspicion standard is "not high," but does require more than a "hunch of criminal activity." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008) (quotations omitted). When determining whether reasonable suspicion exists, we consider the totality of the circumstances, including seemingly innocent factors. *State v. Davis*, 732 N.W.2d 173, 182 (Minn. 2007).

Here, the parties do not dispute that the initial purpose of the stop to check the safety and welfare of the passenger was valid. We agree. Officer Mueller was acting on information from D.P.'s mother to conduct a welfare check. Thus, the purpose of the stop

7

was a check for her welfare. Officer Mueller confirmed that Mays has a violent history in the community and with the police department. The officer saw the "bright red alert for officer safety reasons" attached to Mays because he could be in possession of a firearm. Officer Mueller also confirmed that Mays is ineligible to possess a firearm, has a revoked driver's license, and was driving the vehicle.

The parties disagree as to whether the subsequent search of the vehicle was reasonable. An officer may conduct a "protective search" of a vehicle if the officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity" and the officer "possesses a reasonable belief, based on specific and articulable facts, that the suspect is dangerous and may gain immediate control of a weapon." *State v. Flowers*, 734 N.W.2d 239, 251 (Minn. 2007) (quotation omitted).

The inquiry into whether a protective sweep is constitutionally valid involves two steps. *Id.* First, it must be decided whether the stop was justified. *State v. Askerooth*, 681 N.W.2d 353, 364 (Minn. 2004). Here, the stop was justified. Next, it must be decided whether the officer's actions are reasonably related to and justified by the circumstances justifying the stop. *Id.* Each intrusion must be tied to and justified by: "(1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry* [*v. Ohio*, 392 U.S. 1, 19-20 (1968)]." *Id.* at 365.

Here, we conclude that the protective sweep of the vehicle was justified by the original purpose of the stop—the welfare check of D.P. based on her mother's report of domestic abuse.

8

The delay in searching the vehicle was brought about by an unusual chain of events, but the record supports the conclusion that Officer Mueller's overall plan always included a protective sweep of the vehicle relative to the intended welfare check of D.P.

Officer Mueller testified that, based on the information that he knew, he always planned to conduct a protective sweep of the vehicle. Officer Mueller knew that N.B. was "very concerned" about D.P.'s well-being because she had observed bruising on D.P.'s face and reported that Mays has a firearm and had "pistol-whipped" D.P. Officer Mueller knew that a "bright red alert for officer safety reasons" had been attached to Mays because he could be "in possession of a firearm."

Officer Mueller observed Mays make a furtive movement in the vehicle, tilting his body toward the passenger side. The officer described this as "abnormal." Mays then stopped the vehicle "right in the middle of a busy, busy intersection" and walked back toward the officer. The officer viewed this as Mays attempting to prevent the officer from looking in the vehicle.

Officer Mueller initially approached the driver's side door and looked inside the vehicle "to conduct a protective sweep" but decided to leave "the vehicle alone" because Mays had come up behind him and made him feel "very uncomfortable." The officer's "senses [were] heightened" because Mays was "a known person to have firearms." Officer Mueller described the situation from his perspective "[a]s an officer [to be] very unsafe."

During Officer Mueller's conversation with D.P., he observed signs of abuse. D.P. was visibly upset. D.P. stated that her plan had been for Mays to drop her off so that she could "get help." The officer asked D.P. if she had mentioned a weapon when talking to

her mother. D.P. stated that she had not mentioned a weapon but stated that she "wanted to blow [her] brains out. . . . [w]ith a gun." The officer explained to D.P. that law enforcement is going to get involved when she makes a statement like that, and when they have knowledge that Mays has been threatening D.P. and Mays has possession of a firearm.

It was Officer Mueller's sergeant's decision to move the vehicle to a safer location. Officer Mueller testified that he told his sergeant that he was uncomfortable moving the vehicle because he had not finished conducting a protective sweep. He then walked back to Mays's vehicle and asked Mays to exit the vehicle so that he could search the vehicle.

Mays argues that, after the officer told him that he was going to cite him for driving after revocation and returned to his vehicle, the reason for the stop had ended. He argues that he was calm at this point, so any concern about officer safety had dissipated. But driving after revocation was not the reason for the stop and officers had to work continuously to deescalate Mays's behavior so that officers could investigate a possible domestic assault. And achieving a calm presence does not mean the state of calm remains. Mays went from antagonistic and threatening self-harm, to calm when he returned to the vehicle, and then back to chaotic.

Further, when Officer Mueller returned to his squad car, he was able to relay all of the relevant information to his supervising sergeant. The sergeant had arrived "not knowing what was going on," and his main concern was getting the vehicle off the busy street. Officer Mueller was able to tell his sergeant that he was not comfortable moving the vehicle because he was "continuing to conduct the business which would have included . . . [the] protective sweep of the vehicle but also a citation that was to follow." The district

10

court did not factor in the officer's testimony that he had this conversation with the sergeant, so that the sergeant understood that the original stop was not complete. Based on this record, the district court erred in suppressing the evidence and dismissing the firearm-possession charge because the protective sweep was justified by the original purpose for the stop.

**Reversed and remanded.**