STATE of Minnesota, Respondent,

v.

Eugene Erick FORT, Appellant.

No. A08–0027.

Supreme Court of Minnesota.

July 16, 2009.

Rehearing Denied July 27, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

Lawrence Hammerling, Chief Appellate Public Defender, Jessica Merz Godes, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

Appellant Eugene Erick Fort was convicted of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), and first-degree murder while committing burglary, Minn.Stat. § 609.185(a)(3), in connection with the December 15, 1990, stabbing death of 11–year–old Marcus Potts. Fort asserts five errors, and also raises additional arguments in his pro se brief. We affirm in part and hold that Fort's asserted errors do not require reversal of his first-degree premeditated murder conviction. We do, however, reverse Fort's conviction for first-degree felony murder.

Sometime between midnight and 1 a.m. on December 15, 1990, a man broke in to 11–year–old Marcus Potts' home in the lower duplex unit of 1406 16th Avenue North in Minneapolis and stabbed Potts 44 times, causing his death. Six-year-old A.W. lived in the upper unit of the same duplex as Potts. On the night of the killing, A.W. was in her room trying to fall asleep when she heard a "big bang" from the lower unit. She heard Potts say "who are you?" A voice, which A.W. did not recognize but believed to be that of an African American male, responded "don't worry about it." A.W. heard Potts begin screaming for A.W.'s aunt and cousin, as well as Potts' mom and dad. A.W. also heard running. At some point, A.W. heard the man say, "shut up before I kill you." When Potts continued to scream, the man said, "now you're going to die."

A forensic examination of the scene indicated that Potts was stabbed in three locations in the house. There were blood spatters in the hallway outside Potts' bedroom. There were also blood spatters inside Potts' bedroom near the door. There were slash marks on Potts' mattress, indicating that there was stabbing on the bed. Potts was stabbed in the neck and the back. The back injuries exhibited minimal bleeding, which indicated that Potts was near death when those stab wounds were inflicted. Despite a thorough search, no

usable fingerprints were found at the scene.

At approximately 2 a.m., the victim's mother arrived home from work. She noticed that all of the drawers in the kitchen pantry were pulled out and the side door from the kitchen to the outdoors was open. Eventually, she entered Potts' room, where she saw him lying on the floor, not moving, in a pool of blood. She called 911, but Potts was already dead.

After Potts' mother called 911, emergency personnel began to arrive from the Minneapolis Fire Department and the Minneapolis Police Department. One of the firefighters who arrived on the scene noticed a car start up near the Potts home. He identified the car as a 1976 Pontiac Grand Prix. A man, whom the firefighter later identified as Fort, got out of the car and brushed snow off of the car.

When the police investigated the scene, they noticed a set of footprints in the snow leading away from the side door to the Potts home. A police dog picked up a scent from the footprints and followed the scent and the prints to the steps of 1414 16th Avenue North, where Fort lived. The dog followed the scent from the steps to the street. The officer accompanying the police dog testified that he believed a car had been parked on the street where the dog lost the scent.

Fort's mother testified that Fort was in and out of the house that night. When the emergency vehicles arrived, Fort was home but went out to his car. While he was outside, his aunt, who lived with him, asked him what happened and Fort responded that someone got hurt next door. He then left the area and drove with his cousin, Paul Rice, to Fort's grandmother's house. Fort told his grandmother that a man and a child had been killed. Fort and Rice left sometime the next morning.

At 6:30 a.m. on December 15, the police obtained a search warrant for Fort's residence. The police seized a pair of Nike shoes that were consistent with the pattern left in the snow, another athletic shoe, $100 in cash, a wet winter jacket, and a pair of pants. Subsequent forensic analysis did not find blood on the shoes or jacket, and, while blood was found on the pair of pants, it was not a DNA match for either Potts or Fort.

Around 10:30 a.m., Fort went to the Potts residence to ask the police to return items that the police had seized under the warrant earlier that morning. At that time, he told the police that he had been at his grandmother's house since the previous night at 10:30 p.m. The police then questioned him again on tape, and he stated that he had walked to his grandmother's around 9:30 p.m. and had stayed there until the morning. He denied driving at all.

He was eventually taken to the police station where he was interrogated for a third time. There, Fort said that he had been at his grandmother's at 9 p.m. the previous evening, but when confronted with the fact that his mother saw him leaving his home at 2 a.m., he said he did not have a watch that night and he thought it was 9 p.m. but it may have been midnight or even 3 a.m. Fort told the interrogating officer that the police did not have any evidence, witnesses, blood, or fingerprints from the scene. The interrogating officer felt that Fort's statement about the evidence was suspicious because the police had not provided Fort with any information about the crime scene. The officer did not see any scratches on Fort, which would have indicated a struggle.

On December 27, 1990, the police obtained a second search warrant for Fort's home. After the first search had been concluded, the police acquired equipment

from the Minnesota Bureau of Criminal Apprehension ("BCA") that could detect blood that was not visible to the naked eye. The machine, which was unavailable when the first warrant was executed on December 15, detected eight small drops of blood in the Fort residence. The sample was too small to be tested using the technology available in 1990, but when the samples were tested using technology available in 2001 the samples were found to contain a DNA profile that matched that of Potts. The BCA forensic scientist who tested the samples in 2001 testified that the chances of a person matching the DNA profile were 1 in 126,000.

At trial, four witnesses testified that, while in a Hennepin County jail, Fort confessed to them that he committed the crime. W.H. met Fort in a holding cell. W.H. said to Fort, "I hope they don't put us in with the—that guy who had killed the little boy." Fort responded "you mean me?" W.H. asked Fort if "you did that?" and Fort responded "Well, that's what they say." Fort then told him that he was in the house trying to find money, when Potts appeared and Fort got scared and "stuck" him. Fort told W.H. that after the stabbing he got in his car at 2 a.m. and drove around, and changed clothes at his aunt's house.[1] At some point, Fort was verbally assailed by other inmates and began pacing and ranting, saying, "they ain't got nothing, they can't prove nothing, they ain't got nothing on me." W.H. testified that, although he was aware of the Potts killing from the news, he did not know that

Potts was killed by stabbing until Fort told him.

Another inmate, D.I., also testified that appellant had spoken to him about the killing. D.I. said that Fort recognized him because D.I. had played piano at a church, and Fort wanted to engage him in a conversation about religion. Fort asked him "if [Fort] had done something or hurt someone accidentally, would God forgive him?" Later, D.I. and Fort had another conversation where Fort told him that "I was going to do a bird,"[2] and in the course of the burglary "someone came up on him" and he and the person "fought down the hallway" and Fort "began to stick him." Fort said that he "just panicked" and then left the house through the back. In a third conversation in another holding cell about a month later, Fort reiterated to D.I. that Potts startled him and Fort stated that "I just got to sticking him." Fort also said that, "These [cops] don't have anything on me, and I'm on my way out of here. I'm going back to Illinois."

J.B. testified that he overheard a conversation in the holding cell between D.I. and Fort. He heard D.I. ask Fort "did you do that to Potts?" and Fort responded "yes." Fort also stated that the police would never catch him. Fort never engaged J.B. in direct conversation.

C.W. was the last person to testify that he heard Fort confess. C.W. stated that he was in jail on December 31, 1990. Fort spoke to C.W. because C.W. knew his uncle who lives in Indiana. Fort told C.W. that he was trying to recruit Potts for a gang. Fort also said that he had killed

---

1. The defense challenged this portion of the testimony at trial, arguing that Fort had not changed clothes all night, and he was wearing the same red jacket and shoes the entire night. For support, the defense presented testimony from a police officer that two witnesses had seen Fort wearing red shoes at 8:30 or 8:45 p.m. on December 14, and that

Fort had been wearing red tennis shoes the next day when interviewed by the police. Additionally, the firefighter who saw Fort at his car also saw him in black and red shoes.

2. D.I. testified that "bird" is slang for "burglary."

Potts because Fort was dealing drugs and was afraid Potts might tell his mother. Fort told C.W. that he stabbed Potts "numerous times." Fort said that he threw the murder weapon in the dumpster behind the Elks Club on Plymouth Avenue in Minneapolis.

In December 2006, Fort was indicted on two counts of first degree murder: first-degree premeditated murder, Minn.Stat. § 609.185(a)(1), and first-degree murder while committing burglary, Minn.Stat. § 609.185(a)(3). A jury found Fort guilty of both counts of first-degree murder.

While the jury was deliberating, A.L. called Fort's defense attorney's office from Hennepin County Jail and left a message that indicated that Fort's cousin, Paul Rice, had confessed to the "whole wing [of the prison]" that he committed the murder. A.L. indicated in the message that Rice had told him that he had "shot a little boy," that Fort was "dumber than a box of rocks" and that Rice had gotten away with the murder by paying off four other witnesses. Based on A.L.'s information, Fort moved for a new trial.

The district court held an evidentiary hearing to take testimony from A.L. as well as other witnesses to whom Rice had allegedly confessed. The first witness to testify was H.N., who said that Rice "explained that he was doing a burglary and that the little boy had seen him and was afraid the little boy would recognize him and tell on him." Rice told H.N. that when he saw the boy he blacked out and ran back to Fort's home and did not realize what he had done until the next day. H.N. said that Rice told him that he paid others to give him an alibi. He also said that Rice confessed in "probably 10 different conversations." H.N., however, told his girlfriend in a taped call that it was a joke. H.N. was also aware of A.L.'s allegations before H.N. came forward.

T.W. also testified that he heard Rice confess in jail. T.W. heard Rice say that Fort was "dumber than a box of rocks." He also heard Rice say that he fooled the police by being ambidextrous. But T.W. denied on the stand ever hearing Rice say he "popped" somebody, despite having mentioned it in his original affidavit. He also said that A.L. was encouraging people to make certain statements to assist Fort.

A.L. testified at the hearing and admitted to being related to Fort. In addition to reiterating the information in his phone call to Fort's counsel, A.L. testified about a phone call he made from prison to a woman named "Michelle" who is Fort's cousin. He told Michelle that "when you talk to the family, let him know that I got them." He also told Michelle that he was the person who "made all this come about."

D.C., another prisoner, testified that he had talked to Rice, who complained that Fort was trying to blame him. Rice told D.C. that "he had nothing to do with it."

Ultimately, the district court denied Fort's motion for a new trial. The district court convicted Fort of both counts of first-degree murder and sentenced Fort on both counts to life imprisonment without possibility of parole. Fort appealed his convictions to this court. He argues that: (1) the district court erred in admitting the evidence from the second search of his home because the warrant lacked probable cause; (2) there was insufficient evidence to prove premeditation; (3) the district court erred in sentencing him on both counts of murder; (4) the district court's instruction on felony murder misstated the law; and (5) the district court erred in not ordering a new trial based on newly discovered evidence. Fort also alleges various errors in his pro se brief.

## I.

Fort argues that the district court erred in admitting DNA evidence obtained dur-

ing the December 27, 1990, search because the warrant lacked probable cause. The Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution require probable cause prior to the issuance of a warrant. Here, it is undisputed that the police had warrants when they searched Fort's home both the first and second time.

■ A search warrant is supported by probable cause if there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Wiley*, 366 N.W.2d 265, 268 (Minn.1985) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). We consider the totality of the circumstances when making the determination of whether there is probable cause. *Id.* In reviewing an issuing judge's probable cause determination, we give "great deference" to the judge's decision. *State v. Rochefort*, 631 N.W.2d 802, 804 (Minn. 2001). We consider whether the information presented in the affidavits provided to support probable cause presents "specific facts to establish a direct connection between the alleged criminal activity and the site to be searched." *State v. Souto*, 578 N.W.2d 744, 749 (Minn.1998).

In *State v. Zanter*, we considered whether evidence seized during a subsequent search of the same residence based on probable cause used for a previous search was admissible. 535 N.W.2d 624, 632 (Minn.1995). We held that a warrant to search the same location for new evidence is valid so long as there is new probable cause. *Id.* at 633. There, after two previous searches, the police had learned that the defendant's wife had asked at work about techniques to remove blood from carpet and walls. *Id.* Accordingly, we concluded that a new warrant to search the premises for blood on the floors and walls was supported by probable cause.

*Id.* But we also held that that other evidence obtained elsewhere in the house based on probable cause for which a warrant had already been issued should be suppressed. *Id.* at 634. Because the police had already used the old probable cause "to justify two previous, exhaustive searches of the same residence," the police could not "expect to re-search that area at a later date without providing the issuing judge with new information sufficient to indicate that items sought, but not found, during prior searches will now be found." *Id.* at 633. We concluded that the issuing judge did not have a "substantial basis" for deciding that probable cause existed to re-search the house for the same items that had been subject to a previous search warrant. *Id.* at 634.

■ Fort argues that the blood found during the second search of his home should be suppressed because the police relied on the same affidavits for the first warrant and the second warrant, and the only new information was an additional affidavit stating that the police "now [have] access to crime detecting equipment and personnel ... that was previously unavailable." Fort contends that access to previously unavailable equipment is not new information but merely an alternative method of search and that the evidence should be suppressed. We disagree.

While the first warrant application sought "[a] knife, bloody clothing, footwear, evidence of injury ... [and] a red and white passenger vehicle," the second warrant application specifically sought "traces of blood, bloodlike substance, [and] bloodlike impressions" in addition to bloody clothing and a knife. The second application included an affidavit that clearly stated that the BCA equipment could identify evidence that was not previously detected. The affidavit provided "the issuing judge with new information sufficient to indicate that items sought, but not

found, during prior searches will now be found." *Zanter,* 535 N.W.2d at 633. Therefore, we conclude that there was a "substantial basis" for the issuing judge to make the determination that new evidence would be found, and we affirm the decision of the district court to admit the evidence.

## II.

Fort's second contention is that the State did not present sufficient evidence to show that the killing was premeditated. When reviewing sufficiency of the evidence, we view the evidence "in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Clark,* 755 N.W.2d 241, 256 (Minn. 2008) (quoting *State v. Leake,* 699 N.W.2d 312, 319 (Minn.2005)). Circumstantial evidence "is entitled to the same weight as any other evidence" but must be "consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Leake,* 699 N.W.2d at 319 (citation omitted). The conviction will not be reversed unless, "giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt," the jury could not have found the defendant guilty. *Id.*

Fort was convicted of first-degree premeditated murder. Minnesota Statutes § 609.185(a)(1) states that whoever "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of first-degree murder. Premeditation means "to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2008). Because premeditation is a state of mind, it is usually proven through circumstantial evidence and the circumstances surrounding the killing. *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008).

Premeditation is generally proven through the defendant's actions prior to the killing, motive inferred from the defendant's prior relationship with the victim, evidence as to the nature of the killing from which it can be inferred that the killing was premeditated, or a combination of such evidence. *State v. Kendell,* 723 N.W.2d 597, 605–06 (Minn.2006). Fort argues that the State did not introduce sufficient evidence to prove premeditation. Again, we disagree.

At trial, A.W. testified that she heard Potts screaming and then heard the burglar say "if you don't shut up, I'm going to kill you." After Potts continued to scream, the burglar said "now you're going to die." The planning activity here was verbalized; the burglar stated that he would kill Potts if he did not stop screaming, and then acted on his threat. This evidence is sufficient to prove premeditation.

The State also presented sufficient evidence of motive. Although Fort argues that the burglar was surprised and surprise is not a motive, we have previously held that evidence that a perpetrator was attempting to eliminate witnesses to a crime is evidence of motive. *Id.* at 606. Here, there was a motive to eliminate the witness to the burglary, and there was also motive to cause Potts to "shut up" to conceal the crime. There is sufficient motive evidence to prove premeditation through planning activity.

Fort contends that the State did not present sufficient evidence to prove that the nature of the attack indicated premeditation. Indeed, although Fort concedes that Potts was stabbed 44 times in a particularly brutal manner, Fort points to *State v. Swain,* 269 N.W.2d 707, 713–14 (Minn.1978), for the proposition that a series of blows alone, without other evidence of premeditation, does not prove

premeditation. As a threshold matter, there is sufficient motive and planning activity to prove premeditation even without evidence regarding the nature of the killing. But we have previously held that "a long and severe attack" may be enough to prove premeditation. *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997). Here, the stabbing took place in three areas of the house and involved multiple blows to vital locations, such as the neck. Furthermore, a medical examiner testified that the wounds to Potts' back involved less blood than expected, indicating that the attack occurred over a long period of time. Thus, the nature of the attack supports the State's theory that Potts' murder was premeditated.

There is sufficient evidence to prove premeditation. We therefore affirm the conviction for premeditated first-degree murder.

### III.

■ Fort contends that the district court erred in sentencing him on both first-degree premeditated murder and first-degree felony murder. Minnesota Statutes § 609.185 provides that the crime of first-degree murder can be proved by premeditation *or* by murder in the course of burglary. The State concedes that a defendant may only be convicted for one count of first-degree murder in connection with one murder. *See State v. Johnson*, 616 N.W.2d 720, 730 (Minn.2000). Accordingly, we vacate Fort's conviction for first-degree murder while committing burglary. Our decision today, however, does not disturb Fort's sentence for first-degree premeditated murder, and Fort will continue to serve a life sentence without possibility of parole.

### IV.

■ Fort next argues that the district court misstated the law when it instructed the jury on the elements of first-degree intentional murder in the course of committing burglary. Specifically, Fort argues that the district court erred when it instructed the jury that "[t]he second possibility for the fourth element of Murder in the First Degree While Committing Certain Crimes is that Mr. Fort committed or attempted to commit a crime while in the building, that crime being an assault." Because we have vacated Fort's conviction for first-degree murder while committing burglary, we need not discuss whether this instruction was erroneous.

### V.

■ Fort argues that the district court should have ordered a new trial because of the discovery of new evidence. Specifically, Fort contends that three witnesses who testified at the evidentiary hearing said that they heard Rice confess to committing the crime, and that, as a result, Fort should be given a new trial so that the testimony of those witnesses can be considered by a jury.

■ In order to obtain a new trial based on new evidence, the defendant must show that: (1) the evidence was not known to him or his counsel at the time of trial; (2) the failure to learn of the new evidence was not because of lack of diligence; (3) the evidence is material and is not impeaching, cumulative, or doubtful; and (4) the evidence is likely to produce an acquittal or more favorable result for the defendant. *Pippitt v. State*, 737 N.W.2d 221, 226 (Minn.2007). When considering the content of testimony at a hearing, we bear in mind that the district court "had the opportunity to observe the demeanor of the witnesses when they testified" and review the district court's decision to deny a new trial under an abuse of discretion standard. *Race v. State*, 417 N.W.2d 264, 266–67 (Minn.1987). Both Fort and the State agree that Fort has satisfied the first two prongs of the test, because none of the evidence was known to Fort or his counsel,

and the witnesses only came forward after the trial had ended.

■ Therefore, we restrict our analysis to the elements of materiality and results. In order to be material, and not impeaching, cumulative, or doubtful, the confession of a purported alternative perpetrator must "come forward in a credible manner from a credible source." *Wayne v. State*, 747 N.W.2d 564, 566 (Minn.2008). For the defendant to prove that the new evidence would produce a more favorable result, the defendant must show more than the mere "theoretical possibility" that the new testimony "might alter the jury's verdict." *Wayne v. State*, 498 N.W.2d 446, 448 (Minn.1993). Furthermore, the evidence must be admissible at trial in order to be able to change the outcome. *Id.*

Here, the district court held a hearing and took testimony from four witnesses purporting to offer alternative perpetrator evidence. After hearing the testimony, the district court made specific findings that the evidence of the supposed confession was "simply too doubtful to support ... a new trial" and that the proffered testimony lacked credibility. We hold that the district court did not abuse its discretion in making its determination and affirm the decision not to grant a new trial.

## VI.

Fort also alleges various errors in his pro se brief. Fort echoes his counsel's arguments regarding sufficiency of the evidence for premeditation and for a new trial based on newly discovered evidence, which we need not discuss in detail for a second time. He also argues: (1) there was a lack of probable cause for the warrant; (2) the jury instructions on felony murder were unclear and did not require unanimity on each element; and (3) that the judge should have given instructions on lesser-included offenses. We reject these claims.

■ Fort argues that there was a lack of probable cause for the issuance of the initial warrant. We disagree and hold that the footprints heading from Potts' home to Fort's home provided "specific facts to establish a direct connection between the alleged criminal activity and the site to be searched." *State v. Souto*, 578 N.W.2d 744, 749 (Minn.1998). As a result, the probable cause was sufficient to issue the warrant.

As for Fort's second argument, we need not address any errors that Fort raises regarding his felony murder conviction because we have vacated that conviction.

■ Lastly, Fort argues that the district court should have instructed the jury on the lesser included offenses of second-degree unintentional murder and manslaughter. We review the omission of lesser-included offenses under an abuse of discretion standard. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn.2005). If the evidence warrants a lesser-included-offense instruction, the district court must give one. *Id.* An instruction must be given if: (1) the lesser offense is included in the higher charge; (2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and (3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense. *Id.* at 598.

Fort was charged with first-degree premeditated murder, Minn.Stat. § 609.185, which requires a killing with premeditation and intent to kill. Here, the evidence indicated that the victim was brutally stabbed 44 times after the perpetrator said "if you don't shut up, I'm going to kill you." The combination of that statement and the subsequent killing presents overwhelming evidence of both premeditation and intent to kill. The evidence does not provide a rational basis for acquitting Fort of first-degree murder. Fort was not entitled to

an instruction on any lesser-included offenses.

Affirmed in part and reversed in part.