2010 ND 38

**Reginald TWEED, Petitioner and Appellant**

v.

**STATE of North Dakota, Respondent and Appellee.**

No. 20090171.

Supreme Court of North Dakota.

March 16, 2010.

Rehearing Denied April 6, 2010.

Chad R. McCabe (argued), McCabe Law Firm, Bismarck, ND, for petitioner and appellant.

Mark R. Boening (appeared), Assistant State's Attorney, and Jennifer Cook (argued), appearing under the Rule on the Limited Practice of Law by Law Students, Fargo, ND, for respondent and appellee.

KAPSNER, Justice.

[¶ 1] Reginald Tweed appeals from a district court judgment dismissing his application for post-conviction relief. We hold the district court was not clearly erroneous to find Tweed failed to establish entitlement to post-conviction relief on the basis of either newly discovered evidence or ineffective assistance of counsel. We affirm.

I.

[¶ 2] On April 8, 1991, the deceased body of Terry Dorff was found at his Fargo residence. Dorff had been gagged, with his hands and ankles bound together behind his back in a hogtie position. A large, bloodied rock was found beside Dorff's head, and his face and head were badly beaten. Police found a unique key chain in Dorff's bedroom, which they displayed to the media to help find leads in Dorff's death. Tweed's wife recognized the key chain and called police, stating it belonged to her estranged husband. Tweed's wife also called Tweed to inform

him that she had called the police. Soon after receiving the call from his wife, Tweed went to the Cass County jail to claim the key chain.

[¶ 3] While at the jail, an investigator with the Cass County states attorney's office questioned Tweed. Tweed told the investigator he and David Sumner met Dorff at an adult bookstore in Fargo during the early morning hours of April 8, 1991. Tweed said Dorff invited them to go back to his residence and drink beer. Tweed then explained what caused the night to turn violent:

> Terry [Dorff] start[ed] to reach for my crotch. I got angry. I hit him. Then he started to hit back. Then Dave [Sumner] and I tied him up because he started to kick. He also said he was going to call the police. We tied him up with speaker wire. We tied his hands behind his back. (He started to take his pants off before I hit him, and fuck no I didn't like that.) We tied his feet together with his hands. We grabbed the closest thing and put it in his mouth. He said he was going to call the cops so needed a head start. Because we were scared. He was still struggling so Dave hit him with a rock. He wasn't out yet. So I hit him with the rock. We left Terry was still alive. We took the gag away from his mouth and we still heard him breathing. We left but came back because I realized I had lost my keys to my car. But I didn't get back into the house. We thought we saw someone.

The police arrested Tweed and Sumner and charged both with murdering Dorff.

[¶ 4] Tweed and Sumner were tried separately. Tweed's trial was held first in October 1991. Fargo police officer Paul Lies testified he was one of the first officers to arrive at the crime scene. When he arrived, Lies stated he observed Dorff's body lying face down on a waterbed. Lies

testified Dorff's body was naked from the waist down, and a pillow was lying on his head. Lies stated Dorff's hands and ankles were bound together behind his back. When another police officer pulled back a corner of the pillow, Lies testified he saw a rock lying right next to Dorff's bloodied head. Fargo police officer Gregory Stone also testified. Stone stated when police found Dorff's body, a gag had been tied around his neck. He stated the gag was "not completely inside [Dorff's] mouth, but right at the opening and in the mouth." Stone testified there were blood splatters on the headboard and computer monitor in Dorff's bedroom, both of which were approximately two-and-a-half feet from Dorff's head.

[¶ 5] Dr. Maureen Frikke testified she performed an autopsy on Dorff and determined his death was caused by a combination of blood loss and asphyxia. Frikke stated Dorff suffered blood loss due to five head lacerations. Frikke testified the lacerations were caused by blunt force trauma, possibly being struck by the rock police discovered on Dorff's bed. Frikke opined just two of the lacerations could have caused immediate, significant blood loss. In addition, Frikke stated the asphyxia was caused by several factors. First, Frikke testified the oral gag would have blocked the "full free flow of air through the mouth into the lungs." Second, Frikke stated binding Dorff's hands and ankles behind his back "severely compromise[d]" his ability to breathe. Frikke testified persons have been asphyxiated solely due to being left in a hogtie position. Third, Frikke testified asphyxia was caused by the position of Dorff's face against the waterbed. Frikke stated police photographs showed Dorff's face compressed against the waterbed, which would have restricted his airflow. Frikke also testified the autopsy revealed Dorff's nose

had been compressed for a significant period of time. She stated this compression suggests Dorff was unconscious when he died because "a conscious person would have moved his head so that he would have had the nose and the mouth as free from obstruction as possible." Finally, Frikke stated the waterbed would have exacerbated the asphyxia caused by the position of Dorff's face because "water beds have a nonabsorb[e]nt, non-air-permeable surface" and "when you put something down on [a water bed], the object sinks into the water bed, and the surface of the water bed comes up around it and it molds against whatever is there."

[¶ 6] Tweed called Sumner to testify in his defense. However, Sumner invoked his privilege against self-incrimination under the Fifth Amendment and refused. Tweed then testified. On the night of April 7, 1991, Tweed said he and Sumner consumed approximately eighteen beers at Sumner's house before going to a bar in Moorhead and continuing to drink. Tweed did not recall how much he drank at the bar, but said it was "[q]uite a lot." After the bar closed, Tweed testified he and Sumner went to an adult bookstore in Fargo. By this time, Tweed said they were "pretty drunk." While at the bookstore, Tweed testified he and Sumner first met Dorff, who invited the pair to his place to drink some beer. Tweed stated Dorff drove them to his residence, where all three went into a basement and began to drink beer and converse. Tweed then described what caused the night to turn violent:

> A: I was talking to Dave [Sumner], and—and I don't know if we were—just the way Dave looked over my shoulder or something, because I did—turned around and did a 180, and there's Terry with his pants off. And I looked at him all shocked, and he grabbed my crotch. And I started hitting him.

Q: Okay. Up to that point did you have any reason that you were going to find yourself in that sort of situation?

A: No.

Q: Did he actually touch you? Terry Dorff.

A: Yeah.

Q: What was your reaction?

A: I—I just got really angry, and I started hitting him.

Q: What happened then?

A: I started hitting him for a while, and he started fighting back, you know, and I kind of, you know, wrestled him over to the bed. And Dave jumped in there, and he started hitting him, too.

. . . .

Q: So what—what happened?

A: We—we tied him up, because he was trying to fight back. And as soon as we had him all tied up, we decided to leave, you know, and he was yelling for help, so we put a gag in his mouth and knocked him out on our way out to get a good head start.

. . . .

Q: Did you hog—tie him in the manner that's described right away?

A: Yeah. We didn't do that right away, no.

Q: Well, what did you do?

A: We just tied him up, you know, and he was still, you know, he was hitting us like this (indicating). We untied his hands and put them behind his back. And—and while he was like that, I just—I don't know why, but I took a—I took a string and went from his hands to his ankles and we tied it like that.

Q: Okay. Was David Sumner helping you out to tie him up?

A: Yeah.

. . . .

Q: Well, after you had him tied, what happened next?

A: We decided to get a head start from him, you know, before he got his roommates woke up, and we decided to knock him out.

Q: Was he on the bed at that time?

A: Yeah, he was on the bed.

Q: How did he get to the bed?

A: That's where I wrestled him down and that's where he stayed.

. . . .

Q: And you mentioned you wanted to get a head start. So what did you do? What happened?

A: One of us, I can't remember which one of us, decided that—that we should knock him out, you know, then we'd be able to get quite a ways away before he woke up. And Dave picked up this rock, it was the closest thing, and hit him in the head with it. And he wasn't out yet, so I—I picked up the rock and I hit him in the head, and he was knocked out.

Q: Before that time, before you hit him, had you—had you applied the gag that has been introduced into evidence?

A: Excuse me?

Q: Had you put on this gag before you hit him or after?

A: Before we hit him.

Q: Okay. When did you do that?

A: It was right after we tied him up.

Q: And what is that gag? I mean, where did you get it, do you remember?

A: One of us just grabbed it off the floor, I think, and tied a knot in it and put that knot in his mouth.

Q: After you hit Terry Dorff—do you remember how many times you hit Terry Dorff?

A: Just one time.

Q: Are you sure about that?

A: I'm positive.

Q: What happened then?

A: Then I said, "Let's get out of here." As I went out the door, this dog kind of tried to jump into the room, so I wrapped my arms around it and carried it back out and shut the door behind me and waited for Dave.

Q: Before leaving did you do anything with the gag?

A: Yeah. I took the—the gag out of his mouth.

Q: Why did you do that?

A: Because he's been—he'd been drinking and we'd been drinking, and—and if I—if I pass out or something, then one of my friends will put my head to the side so if I throw up, I ain't going to choke on it.

. . . .

Q: And did Dave stay in the room for a while?

A: He was only in there for a short time.

Q: What happened next?

A: We ran up the stairs and went outside.

. . . .

Q: There's been evidence that there were five blows inflicted upon Terry Dorff. Can you account for five blows being inflicted upon Terry Dorff?

A: No, I can't. Two blows.

Q: But it's obvious that there were five. Do you—do you have any idea where there—where the other three, how—how they happened?

A: I can only make assumptions for that as to what happened.

Q: Did you see the other three being inflicted?

A: No, I didn't.

Q: Did you inflict—

A: No, I didn't.

Q: —those three yourself?

A: No.

. . . .

Q: When you left Terry Dorff, did you think he was alive or did you think he was dead?

A: I know he was alive. I know he was.

Q: You know he was alive?

A: Yeah.

Q: How do you know he was alive?

A: Because I took the gag out of his mouth and he was still breathing.

[¶ 7] During cross-examination, the state's attorney showed Tweed photographs of the crime scene. While the photographs showed a pillow lying on Dorff's head and the rock next to it, Tweed stated he never saw either the pillow or rock in the depicted positions. Tweed testified that, after he struck Dorff with the rock, he tossed it a couple of feet away on the bed. In addition, Tweed stated both he and Sumner participated in tying Dorff in the hogtie position and placing the gag in his mouth. However, Tweed testified he could not remember specifically who tied the knot in the gag or placed the gag in Dorff's mouth:

Q: Who tied the knot in the gag?

A: I can't recall.

Q: You don't remember?

A: No. I remember we were helping each other with the—holding it.

Q: You both participated in tying the knot?

A: Tying him up and tying the knot.

Q: I'm sorry.

A: Tying him up and putting this gag in his mouth.

Q: You both did that together?

A: Yeah.

. . . .

Q: Who tied the gag around his head?

A: I can't recall.

Q: You don't remember?

A: No. Everything happened really fast.

However, Tweed stated he specifically recalled removing the gag from Dorff's mouth before he left the bedroom:

Q: But you do remember removing [the gag]?

A: Yes, I do.

Q: How did you do that?

A: I just reached over there and pulled it down.

. . . .

Q: When the gag was in his mouth and you tried to remove it, was it tied tightly?

A: I can't recall if it was or not.

Q: You don't recall if it was difficult to remove or not?

A: No, I don't recall if it was difficult to remove or not.

Tweed testified Dorff was unconscious, face down on the waterbed when he removed the gag. Tweed stated he rolled Dorff's head to the side before leaving the room. Tweed testified that, when he left, Dorff was bleeding from his nose and the two lacerations on his head. However, Tweed testified "there wasn't blood splattered anywhere." Specifically, Tweed said there were no blood splatters on the computer monitor or headboard when he was in Dorff's bedroom.

[¶ 8] Finally, Tweed addressed the discrepancy between his direct testimony, where Tweed said he left Sumner alone with Dorff in the bedroom after each had struck Dorff once with the rock, and his initial statement to investigators, in which he did not mention leaving Sumner alone with Dorff.

Q: You know, I've read [the written statement] a number of times since I first got a copy shortly after you got— you gave it. I don't see anywhere in there where you indicate that you left Sumner alone with Dorff. Did you ever tell that to [the investigator]?

A: I'm not sure if I did or not.

Q: You don't recall?

A: I don't recall.

Q: It's kind of important. You want to think for a second?

A: I must have—I did tell him that I got—you know, I was the first one out the door and I grabbed the dog and took it out with me, shut the door behind me. Basically that would leave him alone.

. . . .

Q: Let's back up a second. What do you remember telling [the investigator] about leaving Sumner alone with Dorff?

A: [The investigator] didn't specifically ask that. But what I did tell him, I told him that—that I was the first one out the door and the dog kind of jumped in and I grabbed the dog and took it out with me.

[¶ 9] On October 24, 1991, a jury convicted Tweed of class AA felony murder. The district court sentenced Tweed to life in prison on the following day. Tweed filed a notice of appeal in November 1991, arguing the district court erred by failing to instruct the jury on the charge of negligent homicide and the language of the murder statute was unconstitutionally vague. On October 6, 1992, this Court affirmed Tweed's conviction. *State v. Tweed,* 491 N.W.2d 412 (N.D.1992).

[¶ 10] Sumner's trial for Dorff's murder was scheduled to begin in mid-February 1992. A few weeks prior, Todd Suedel, a prisoner in the Cass County jail, made a statement to police regarding what Sumner had told him about Dorff's murder. Suedel told police:

At first [Sumner] told me he didn't have anything to do with the actual murder. But he was at the bookstore with Tweed. He went home after that. Tweed had called him and told him to come over to Dorff's house and help him burn a car. So Dave drove over there, he said, and helped Tweed burn the car. Like I said, for several weeks we talked and I questioned why he would go to someone else's house he didn't know and burn the car if he wasn't trying to cover something up. I told him that wouldn't look good to a detective or jury. He admitted that he was with Tweed at Dorff's house. Through the next few weeks he also admitted that he took part in the murder by hitting Dorff. He said between the four walls and myself that no one could prove how many times he hit Dorff with the rock. Tweed hit him once or twice and then left the room. I asked him, so no one ever saw you at Dorff's house or hit him. He said no, they can't prove how many times I hit him. That is between me, the walls, Terry Dorff. The only person who can put me near the crime was some lady who seen me 100 feet away from Dorff's car.

Suedel said he understood Sumner to be implying he hit Dorff with the rock outside of Tweed's presence.

[¶ 11] Suedel also told police he had informed his attorney about what Sumner told him. Suedel stated: "[My attorney] came by one day and he said [']Y]ou've been trying to get a hold of me. I already know why you want to see me.['] I told him about Sumner and another thing I had with my case." At that time, Mark Beauchene was representing Suedel as appointed defense counsel in an unrelated case. Beauchene had also served as Tweed's ap-

pointed defense counsel during his murder trial. When Suedel made the statement to police, Tweed's original appeal was pending before this Court. The State introduced Suedel's statements as evidence at Sumner's trial. The State also called Tweed as a witness, but he invoked his privilege against self-incrimination under the Fifth Amendment and refused to testify. A jury acquitted Sumner of murder.

[¶ 12] On October 31, 2008, Tweed filed an application for post-conviction relief asking the district court to either vacate his murder conviction or order a new trial. Among other reasons, Tweed argued he was entitled to post-conviction relief on the basis of newly discovered evidence and ineffective assistance of counsel. Tweed argued the newly discovered evidence included Suedel's statement to police and Sumner's availability as a witness. Tweed became aware of Suedel's statement shortly before the hearing on his application for post-conviction relief when the State produced it in response to his discovery requests. In addition, Tweed claimed Sumner was now available to testify because double jeopardy prohibits the State from retrying him for Dorff's murder. Without the threat of criminal prosecution, Tweed argued Sumner could no longer refuse to testify under the Fifth Amendment. Furthermore, Tweed claimed he received ineffective assistance of counsel because Beauchene failed to raise Sumner's availability as a witness, his representation of Suedel created a conflict of interest, he tried to obtain $20,000 from Tweed in exchange for better performance, and he made statements prejudicial to Tweed during trial.

[¶ 13] At the hearing, Beauchene testified he recalls representing Tweed, but has forgotten most of the case's details. Beauchene stated he does not recall making any motions on Tweed's behalf after Sumner was acquitted and while Tweed's appeal was pending before this Court. Beauchene testified he did not consider Sumner's acquittal to provide Tweed with any grounds for post-conviction relief. Beauchene stated he did not independently recall representing Suedel, though he may have. Beauchene testified he did not know whether he received a copy of Suedel's statement to police, nor does he recall speaking to Suedel regarding what Sumner told him about Dorff's murder. Finally, Beauchene testified he did not recall asking Tweed to pay him $20,000 and called the allegation "quite unlikely." Tweed also testified at the hearing. He stated "Mr. Beauchene asked me for $20,000 on the side," and "told me that if I didn't come up with it, I would probably end up doing way more time [in prison]." After Sumner was acquitted in Dorff's murder, Tweed testified Beauchene did not contact him to suggest he might have the opportunity for post-conviction relief or a new trial.

[¶ 14] The district court denied Tweed's application for post-conviction relief in its entirety. The district court found Tweed failed to prove either the existence of newly discovered evidence sufficient to warrant a new trial or that he received ineffective assistance of counsel. Tweed now appeals.

## II.

[¶ 15] In *Moore v. State*, 2007 ND 96, ¶ 8, 734 N.W.2d 336, we described our review of applications for post-conviction relief:

> Proceedings on applications for post-conviction relief are civil in nature and governed by the North Dakota Rules of Civil Procedure. *Rümmer v. State*, 2006 ND 216, ¶ 9, 722 N.W.2d 528. The petitioner has the burden of establishing grounds for post-conviction relief. *Flanagan v. State*, 2006 ND 76, ¶ 10, 712

N.W.2d 602. The district court's findings of fact in a post-conviction proceeding will not be disturbed on appeal unless they are clearly erroneous under N.D.R.Civ.P. 52(a). *Laib v. State*, 2005 ND 187, ¶ 11, 705 N.W.2d 845.

A finding of fact is clearly erroneous if induced by an erroneous view of the law, if no evidence exists to support it, or if the reviewing court is left with a definite and firm conviction a mistake has been made. *Bernhardt v. Harrington*, 2009 ND 189, ¶ 5, 775 N.W.2d 682. Questions of law are fully reviewable on appeal in post-conviction proceedings. *Syvertson v. State*, 2005 ND 128, ¶ 4, 699 N.W.2d 855 (citing *Greywind v. State*, 2004 ND 213, ¶ 5, 689 N.W.2d 390).

## A.

 [¶ 16] Tweed argues the district court erred when it denied his application for post-conviction relief on the grounds of newly discovered evidence, specifically Suedel's statement to police and Sumner's availability as a witness. A district court may grant post-conviction relief when "[e]vidence, not previously presented and heard, exists requiring vacation of the conviction or sentence in the interest of justice." N.D.C.C. § 29–32.1–01(1)(e). "[The] statutory ground for post-conviction relief is similar to a request for new trial based on newly discovered evidence under N.D.R.Crim.P. 33." *Moore*, 2007 ND 96, ¶ 9, 734 N.W.2d 336 (citations omitted). To prevail on a motion for new trial on the basis of newly discovered evidence under N.D.R.Crim.P. 33, "the defendant must show: '(1) the evidence was discovered after trial, (2) the failure to learn about the evidence at the time of trial was not the result of the defendant's lack of diligence, (3) the newly discovered evidence is material to the issues at trial, and (4) the weight and quality of the newly discovered evidence would likely result in an acquit-

tal.' " *Id.* (quoting *Syvertson*, 2005 ND 128, ¶ 9, 699 N.W.2d 855). If the newly discovered evidence is not likely to be believed by a jury or change the result of the original trial, the defendant has failed to meet the burden of proof. *Syvertson*, at ¶ 9 (citing *State v. Steinbach*, 1998 ND 18, ¶ 22, 575 N.W.2d 193).

[¶ 17] Tweed argues he is entitled to post-conviction relief on the basis of Suedel's statement to police. Suedel told police:

> [Sumner] admitted that he was with Tweed at Dorff's house. Through the next few weeks he also admitted that he took part in the murder by hitting Dorff. He said between the four walls and myself that no one could prove how many times he hit Dorff with the rock. Tweed hit him once or twice and then left the room. I asked him, so no one ever saw you at Dorff's house or hit him. He said no, they can't prove how many times I hit him. That is between me, the walls, Terry Dorff. The only person who can put me near the crime was some lady who seen me 100 feet away from Dorff's car.

Suedel also told police he understood Sumner to be implying he hit Dorff on the head outside of Tweed's presence. Suedel made the statement to police in February 1992, after Tweed had already been convicted of Dorff's murder. Tweed became aware of Suedel's statement shortly before the hearing on his application for post-conviction relief when the State produced it in response to his discovery requests. In its decision on Tweed's application, the district court stated: "Tweed produced no evidence at his post-conviction hearing as to the present whereabouts of Suedel. Suedel's statement would not exonerate Tweed, and Tweed has not demonstrated that this evidence would produce an acquittal in the event of retrial." Therefore,

the district court found Tweed failed to establish his entitlement to post-conviction relief on the basis of Suedel's statement to police.

[¶ 18] The parties do not dispute Tweed discovered Suedel's statement after trial and his failure to learn about it earlier was not due to a lack of diligence. Tweed claims the statement also meets the final two requirements for a new trial on the basis of newly discovered evidence. Tweed argues Suedel's statement is material to issues at trial because the autopsy report indicated Dorff had five head lacerations caused by blunt force trauma and Tweed testified he was only aware of two. Tweed claims the admission of Suedel's statement into evidence would likely lead to his acquittal because the statement proves Sumner killed Dorff by striking him with the rock three more times after Tweed left the room. Therefore, Tweed argues the district court was clearly erroneous to find he did not prove his entitlement to post-conviction relief on the basis of Suedel's statement. We disagree.

[¶ 19] Tweed bore the burden of proving the weight and quality of Suedel's statement was likely to lead to an acquittal. *Moore*, 2007 ND 96, ¶ 9, 734 N.W.2d 336. We conclude the district court was not clearly erroneous to find he failed to do so. Suedel's statement corroborates evidence at trial, including Tweed's statement to investigators and trial testimony, establishing Tweed struck Dorff with the rock. Though Suedel's statement does not explicitly say as much, a jury might infer Sumner admitted striking Dorff with the rock several times outside of Tweed's presence. Nevertheless, even if such inference is made, Suedel's statement does not eliminate Tweed's culpability for Dorff's murder. With regard to causation, N.D.C.C. § 12.1–02–05 provides: "Causation may be found where the result would not have occurred but for the conduct of the accused operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the accused clearly insufficient." Therefore, for Suedel's statement to be likely to lead to an acquittal, it would have to demonstrate Tweed's actions were clearly insufficient to cause Dorff's death, while Sumner's actions were clearly sufficient. Suedel's statement does not achieve this result.

[¶ 20] Dr. Frikke testified a combination of blood loss and asphyxia caused Dorff's death. Frikke stated the asphyxia was caused by the oral gag, as well as Dorff being left bound, face down on the waterbed. She testified the blood loss was caused by the five head lacerations and that just two lacerations would have led to serious blood loss. During his testimony, Tweed stated he wrestled Dorff on the bed, helped gag and bind him, and then struck him once with the rock. Thus, Tweed admitted to committing several acts that directly caused Dorff's death. While Tweed also testified he removed the gag and turned Dorff's head to the side before leaving the room, jurors may not have found such testimony credible, especially in light of Tweed's inability to recall other details from the night. Therefore, even if Suedel's statement were admitted into evidence and jurors inferred Sumner struck Dorff outside Tweed's presence, Tweed would still likely be found guilty of murder. Suedel's statement does not demonstrate Tweed's actions were clearly insufficient to cause Dorff's death, nor that Sumner's were clearly sufficient. We hold the district court was not clearly erroneous to find Suedel's statement was not of the weight and quality likely to lead to an acquittal.

[¶ 21] Tweed argues he was entitled to post-conviction relief on the basis of Sumner's availability as a witness. Tweed called Sumner as a witness at his murder trial. Sumner, who was awaiting his own trial for Dorff's murder, invoked his privilege against self-incrimination under the Fifth Amendment and refused to testify. A jury subsequently acquitted Sumner of Dorff's murder. In his application for post-conviction relief, Tweed claimed Sumner was now available to testify because he lost the privilege against self-incrimination under the Fifth Amendment. Tweed also argued Sumner's testimony qualified as newly discovered evidence sufficient to warrant a new trial. The district court found Tweed failed to establish Sumner's testimony was likely to result in an acquittal because Tweed failed to "produce any evidence as to what Sumner's testimony would be." Due to this failure, the district court found Tweed failed to establish entitlement to post-conviction relief on the basis of Sumner's availability as a witness.

[¶ 22] Tweed argues we should find the district court erred by denying his application because Sumner's testimony constitutes newly discovered evidence sufficient to warrant a new trial. As support, Tweed notes several other courts have granted post-conviction relief where: two defendants are charged in the same crime; the state tries the defendants separately; during the first defendant's trial, the second defendant refuses to testify on Fifth Amendment grounds; the first defendant is convicted; and the second defendant is subsequently acquitted. For example, Tweed points us to *Whitmore v. State*, 570 S.W.2d 889, 895–97 (Tex.Crim.App.1976), in which the Texas Court of Criminal Appeals granted a convicted murderer's motion for a new trial based on the newly available testimony of an acquitted co-defendant. The court stated:

Where two people were jointly or separately indicted for an offense arising from the same incident, and one was tried and convicted, and subsequently the other was tried and acquitted, a new trial was granted the former to enable him to obtain the testimony of the latter, where it appeared that the new evidence which the law had formerly placed beyond his reach was admissible and material to his defense.

*Id.* at 896 (citations omitted). Tweed argues *Whitmore* demonstrates the district court was clearly erroneous to find Sumner's availability as a witness was not sufficient to justify ordering a new trial.

[¶ 23] We hold the district court was not clearly erroneous to find Tweed failed to demonstrate his entitlement to post-conviction relief on the basis of Sumner's availability as a witness. Despite the broad language quoted above, the Texas Court of Criminal Appeals still required Whitmore prove the acquitted co-defendant's testimony "would probably bring about a different result on another trial." *Whitmore*, 570 S.W.2d at 897. In fact, we are unaware of any court that does not require a defendant seeking a new trial on the basis of newly discovered evidence to meet a similar burden. *See Beach v. State*, 353 Mont. 411, 220 P.3d 667, 672 (2009) (stating party must prove newly discovered evidence creates a reasonable probability that a new trial would result in a different outcome); *Cross v. State*, 221 P.3d 972, 974 (Wyo.2009) (stating party must prove the newly discovered evidence "is so material that it would probably produce a different result"); *State v. Fort*, 768 N.W.2d 335, 344 (Minn.2009) (stating party must prove the newly discovered evidence "is likely to produce an acquittal or more favorable result"); *State v. Muhm*, 775 N.W.2d 508, 523 (S.D.2009) (stating party must prove newly discovered evidence "would probably produce an acquittal").

Thus, the district court correctly found Tweed was not entitled to post-conviction relief solely because Sumner was available to testify. Rather, after establishing Sumner was available to testify, Tweed still had to prove the weight and quality of his testimony was likely to lead to an acquittal. *Moore*, 2007 ND 96, ¶ 9, 734 N.W.2d 336.

[¶ 24] As the district court noted, Tweed failed to produce any direct evidence regarding the likely substance of Sumner's testimony. Tweed did not produce an affidavit signed by Sumner, nor did Tweed submit Sumner's testimony from his own murder trial. *See, e.g., Whitmore*, 570 S.W.2d at 895 ("At the hearing [on the motion for a new trial] appellant offered the testimony of [co-defendant] at his own trial to show what his testimony would have been if [co-defendant] had testified at appellant's trial."). To the extent Tweed relies upon Suedel's police statement to establish the likely substance of Sumner's testimony, such argument fails. As previously addressed, the district court was not clearly erroneous to find Tweed failed to prove Suedel's statement, in which he told police what Sumner said about Dorff's murder while in jail, was likely to lead to an acquittal. Therefore, because the only evidence Tweed produced regarding the likely substance of Sumner's testimony was Suedel's statement to police, we cannot say the district court was clearly erroneous to find Tweed failed to establish the weight and quality of Sumner's testimony was likely to lead to an acquittal.

[¶ 25] We hold the district court was not clearly erroneous to find Tweed failed to prove his entitlement to post-conviction relief on the basis of newly discovered evidence.

B.

[¶ 26] Tweed argues the district court erred when it denied his application for post-conviction relief on the grounds of ineffective assistance of counsel. In *Heckelsmiller v. State*, 2004 ND 191, ¶¶ 3–4, 687 N.W.2d 454, this Court succinctly described the nature of an ineffective assistance of counsel claim:

The Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, § 12 of the North Dakota Constitution guarantee a criminal defendant effective assistance of counsel. *DeCoteau v. State*, 1998 ND 199, ¶ 6, 586 N.W.2d 156. In accord with the test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant claiming ineffective assistance of counsel has a heavy burden of proving (1) counsel's representation fell below an objective standard of reasonableness, and (2) the defendant was prejudiced by counsel's deficient performance. *DeCoteau*, [at ¶ 6] (citing *Mertz v. State*, 535 N.W.2d 834, 836 (N.D.1995)). "Effectiveness of counsel is measured by an 'objective standard of reasonableness' considering 'prevailing professional norms.'" *Lange v. State*, 522 N.W.2d 179, 181 (N.D.1994) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). The defendant must first overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Stoppleworth v. State*, 501 N.W.2d 325, 327 (N.D.1993) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Trial counsel's conduct is presumed to be reasonable and courts consciously attempt to limit the distorting effect of hindsight. *Lange*, 522 N.W.2d at 181.

The prejudice element requires a defendant to "establish a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different." *Syvertson v. State,* 2000 ND 185, ¶ 22, 620 N.W.2d 362. Not only does a criminal defendant have "the heavy, demanding burden of proving counsel's assistance was ineffective," *Mertz v. State,* 535 N.W.2d 834, 836 (N.D.1995) (internal quotations omitted), a defendant claiming ineffective assistance of counsel "must specify how and where trial counsel was incompetent and the probable different result." *State v. Palmer,* 2002 ND 5, ¶ 11, 638 N.W.2d 18. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697, 104 S.Ct. 2052.

This Court does not second-guess counsel's trial tactics. *Noorlun v. State,* 2007 ND 118, ¶ 12, 736 N.W.2d 477. "Merely because a defendant does not prevail in a criminal prosecution that involves strategic choices by trial counsel does not mean those choices constitute ineffective assistance of counsel." *Id.*

[¶ 27] At the hearing on his application for post-conviction relief, Tweed argued he received ineffective assistance of counsel because Beauchene failed to raise Sumner's availability as a witness, Beauchene's representation of Suedel created a conflict of interest, Beauchene tried to obtain $20,000 from Tweed in exchange for better performance, and Beauchene made statements prejudicial to Tweed during trial. The district court found Beauchene employed an "appropriate" trial strategy in light of Tweed's statement to investigators in which he admitted gagging and binding Dorff and striking him with a rock. The district court also found Tweed failed to prove Beauchene tried to elicit a $20,000 payment or how Beauchene's representation of Suedel created a conflict of interest with Tweed's defense. Therefore, the district court found Tweed failed to prove he received ineffective assistance of counsel and denied his claim for post-conviction relief on that basis.

[¶ 28] On appeal, Tweed argues the district court should have found Beauchene provided ineffective assistance of counsel primarily because he failed to move for a new trial on the basis of Sumner's availability as a witness. At the hearing on Tweed's application, Beauchene testified he did not consider Sumner's acquittal, which occurred while Tweed's original appeal was pending before this Court, to provide Tweed with any new grounds for relief. To prove a valid claim for ineffective assistance of counsel on this basis, Tweed must prove an objectively reasonable attorney would have moved for a new trial on the basis of Sumner's availability, and there is a reasonable probability that Tweed would have prevailed on such motion.

[¶ 29] We hold Tweed failed to prove a reasonable probability of success had Beauchene moved for a new trial on the basis of Sumner's availability as a witness. To prevail on a motion for new trial on the basis of newly discovered evidence, a defendant must demonstrate, among other requirements, that the weight and quality of the evidence is likely to result in acquittal. *Moore,* 2007 ND 96, ¶ 9, 734 N.W.2d 336. The only evidence Tweed produced regarding the likely substance of Sumner's testimony was Suedel's statement to police. In that statement, Suedel told police Sumner "admitted that he took part in the murder" and stated "no one could prove

how many times he hit Dorff with the rock." As we explained in section II–A, Suedel's statement does not exculpate Tweed from criminal liability. Thus, even if Sumner testified in the manner suggested by Suedel's statement, the jury would have likely still found Tweed guilty of murder because he admitted to gagging Dorff, leaving him bound in the hogtie position, and striking him in the head with the rock. Therefore, the district court was not clearly erroneous to find Tweed failed to prove a reasonable probability of success had Beauchene moved for a new trial on the basis of Sumner's availability as a witness.

[¶ 30] Because Tweed failed to prove a reasonable probability of success, the district court did not determine whether an objectively reasonable attorney would have made a motion for a new trial on the basis of Sumner's availability as a witness. Suedel told police he informed his attorney, Beauchene, about Sumner's confession. At the time Suedel made this statement, Tweed's original appeal was pending before this Court. Beauchene testified he did not remember representing Suedel, though he possibly did. Beauchene also stated he did not recall ever learning about Sumner's statements to Suedel. If Suedel told Beauchene about Sumner's statements, as Suedel told police he did, Beauchene should have investigated the substance of Suedel's allegations to determine whether they provided any recourse for Tweed. Nevertheless, because Tweed failed to establish a reasonable probability of success had Beauchene moved for a new trial on the basis of Sumner's testimony, he cannot establish a successful ineffective assistance of counsel claim on this ground.

[¶ 31] In addition, Tweed argues the district court should have found Beauchene provided ineffective assistance of counsel by: describing Tweed's statement to investigators as a "confession," failing to object to characterizations of Dorff's death as "murder," and trying to elicit a $20,000 payment in exchange for a better performance at trial. The district court found Beauchene's description of Tweed's statement as a "confession" and failure to object to characterizations of Dorff's death as "murder" were consistent with Tweed's trial strategy of admitting he was involved with the events leading up to Dorff's death but denying he committed the actual murder. The district court also found Tweed failed to prove Beauchene tried to elicit $20,000.

[¶ 32] We hold the district court was not clearly erroneous to find Tweed failed to prove Beauchene's conduct at trial constituted ineffective assistance of counsel. As the district court recognized, Tweed admitted to gagging, binding, and striking Dorff in the head with a rock during his initial meeting with investigators. Because these acts are illegal and exposed Tweed to criminal liability, Beauchene's use of the term "confession" was accurate. In addition, Tweed's defense was not to deny Dorff was murdered, but to suggest Sumner committed the murder. Thus, Beauchene's failure to object to characterizations of Dorff's death as "murder" was consistent with overall trial strategy. Finally, we hold the district court was not clearly erroneous to find Tweed failed to prove Beauchene tried to elicit $20,000 in exchange for better performance at trial. While Tweed testified Beauchene made the request, Beauchene stated he did not remember doing so and found the accusation highly unlikely. "A district court's choice between two permissible views of the weight of the evidence is not clearly erroneous, and simply that we may have viewed the evidence differently does not entitle us to reverse the court's findings of fact." *Aasmundstad v. State*, 2008 ND 206, ¶ 16, 763 N.W.2d 748.

[¶ 33] We hold the district court was not clearly erroneous to find Tweed failed to prove his entitlement to post-conviction relief on the basis of receiving ineffective assistance of counsel.

### III.

[¶ 34] We hold the district court was not clearly erroneous to find Tweed failed to establish entitlement to post-conviction relief on the basis of either newly discovered evidence or ineffective assistance of counsel. We affirm.

[¶ 35] GERALD W. VANDE WALLE, C.J. and DALE V. SANDSTROM, J., concur.

DANIEL J. CROTHERS and MARY MUEHLEN MARING, JJ., concur in the result.